FINALYSON v. UTICA MINING & MILLING CO.

(Circuit Court of Appeals, Eighth Circuit. March 28, 1895.)

No. 474.

1. MASTER AND SERVANT—RULE OF SAFE PLACE.
    The rule requiring a master to provide a reasonably safe place in which his servant may perform his service does not apply to cases in which the very work the servant is employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety, as the work progresses, but in such cases the servant assumes the risk of the dangerous place, and of the increase of danger caused by the work.

2. SAME—FALL OF EARTH IN MINE.
    In an action against a mining company for negligently causing the death of one F., it appeared that F., while at work in preparing a place to

set a timber to make a level in a mine safe for the workmen, had been killed by a fall of a mass of earth that was uncovered by a blast fired a short time before by a miner named A. After the blast A. worked with a pick for an hour to get this mass down, and was about to blast it down when the foreman came along, and A. told him that this was a treacherous chunk, and he replied that he could get it down, and took a pick and tried in vain to do so. The foreman then said that there was lots of time and that they would lose the smelting ore in sight if they blasted it down then, and both men went to work picking up and sacking ore alongside of the mass of earth, where, if it fell, it must strike them unless they could fortunately jump from under it. About twenty minutes after they commenced to pick up and sack the ore, F. came along to timber the level, and asked the foreman where he should cut the notch for the next stull, and the foreman pointed to a place lower than and a little to one side of the mass that fell. F. sat down directly under the mass of earth which fell, and commenced to drill the notch, and after he had drilled in the wall for about half an hour the mass fell and killed him and injured A. *Held*, that there was not sufficient evidence of negligence of the defendant to sustain a verdict for the plaintiff. Caldwell, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

This was an action by Mary Finalyson against the Utica Mining & Milling Company to recover damages for causing the death of plaintiff's husband. The circuit court directed a verdict for the defendant. Plaintiff brings error.

On March 28, 1893, Daniel Finalyson, who was in the employment of the Utica Mining & Milling Company, a corporation, the defendant in error in this case, was so injured by the fall of a mass of sticky mud and other material weighing about 1,200 pounds, which composed a portion of a vein in the Utica mine and is called gouge, that he died. Mary Finalyson, the plaintiff in error, is the widow of Daniel, and she brought this action under the statutes of Colorado to recover damages for the alleged negligence of the company that she averred caused this death. The negligence she alleges in her petition is that the entry in the mine where Finalyson was at work was imperfectly constructed, unsafe, and defectively timbered; that it was the duty of the company to prepare a safely-timbered place, and to keep and maintain the entry in good repair and order, or the timbers thereof in such good repair and quantity as to protect the lives of Finalyson and his colaborers, but that the company conducted itself so negligently in the procurement and erection of timbers to be used in said mine, and in the preparation of places where the miners were compelled to work, as to leave the place where Finalyson was to work in an unfit and dangerous condition; that the company knew of this condition, and that this negligence caused the injury. These allegations were denied by the answer.

The evidence disclosed the following facts: A level called the 400-foot level had been driven in this mine, and the miners were stoping the ore from the roof of this level. Holes were drilled and charged with explosives, which were fired, and in that way the ore bodies were shot down and fell into the level below, or upon a staging built over it. The original roof of this level was about seven feet above its floor, and when the miners had shot down the material as high as they could conveniently work from the level itself and the material that accumulated in it, they constructed of timbers a staging or second floor, about six feet above the bottom of the level, so that the men could work in the drift below this floor while those above it were stoping down the ore higher up in the vein. After ore bodies had been removed to a considerable height, the workmen erected at convenient distances upright posts at each end of a mudsill, which was laid across the floor of the level, placed a cap upon these posts, and then laid a flooring of light sticks of timber from cap to cap. The miners then worked in the drift below this flooring removing the material that had accumulated there, and passing to and fro, while those above it were taking out the ore bodies

from the vein above. This timbering had been completed along this level to within 25 feet of the place of the accident. From this point to a place within 8 feet of the place of the accident, stulls or heavy timbers, the ends of which rested in notches cut in the respective walls of the vein, had been placed across this level, and upon these the light sticks of timber had been placed to make the necessary flooring. Up to this point, 8 feet distant from the place of the accident, the ore bodies in the vein had been taken down to a height varying from 20 to 65 feet from the floor of the level. In this space of 8 feet the workmen were engaged in shooting down the ore from the original roof of the level, and putting in the timbering, working forward along this roof as fast as the ore bodies were removed to a height beyond their reach. Within this 8 feet the level below had become filled with materials that had fallen from above to a height of 6 feet, so that the workmen could stand upon this material to take out the ore bodies along the roof. One Reed was the superintendent of the company, and one Talbert was the underground foreman, who hired and discharged men, and told them when and where to work and what to do. In the forenoon of the day of the accident one Austin, a fellow servant of Finalyson, put a blast into the breast of this stoping just above the original roof of the level, and shot down a body of material. When he returned after dinner, he discovered for the first time that this blast had opened up on the foot wall of the vein, just where the roof had been, a mass of gouge 3 feet long, 2 feet wide, and 18 inches thick. This mass had not been visible until after the morning blast had been fired. Austin took his pick, and worked at it for nearly an hour, but could not get it down, and was about to get his drills and hammer to shoot it down, when the foreman, Talbert, came along, and Austin told him that this was a treacherous looking chunk. Talbert said: "You can get that down." Austin said he could not. Talbert then took a pick, and tried to get it down himself, but he could not. He then remarked: "There is lots of time; if we shoot that, we lose the smelting ore that is alongside of it." Thereupon both men went to work picking up and sacking the ore. They worked so close to this mass of gouge that if it fell it must inevitably fall upon their bodies. unless they fortunately jumped from under it, but Austin testified that he was not satisfied, and thought it might fall at any time. Finalyson had been at work in this mine for two years. He was employed in any work required to be done in the mine, but generally worked at timbering, because he was more apt than others at that work. About 20 minutes after Austin and Talbert had tried to get this gouge down, Finalyson came along, asked Talbert where he should cut the hitch or notch for the next stull so as to have it on a level with those already in place, and Talbert pointed to a place on the foot wall a little lower than, and a little to one side of, this gouge,—a place that was neither in nor under it. Finalyson then cleared away a place, and sat down with his back and shoulders against this chunk, and commenced to drill in the foot wall a place for the notch. After he had drilled away in this wall for half an hour the mass of gouge fell upon and injured him. Upon this state of facts the court below held that there was no evidence of negligence on the part of the company, directed a verdict in its favor, and entered judgment accordingly. This ruling is the error assigned.

H. B. Johnson, for plaintiff in error.

Willard Teller, Harper M. Orahood, and Edward B. Morgan, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts, delivered the opinion of the court.

In granting the motion of the mining company to direct a verdict in its favor, Judge Hallett, who tried this case in the court below, declared that it was immaterial in his opinion whether the foreman was or was not a vice principal of the company, and that if he had been its president there would have been no evidence of negligence in

this case that would warrant a verdict against the company. We have been forced to the conclusion that this ruling was right on two grounds: (1) Because the ordinary rule of "safe place" cannot be justly applied to this case; and (2) because there is no evidence in the case that would warrant a verdict that the company or the foreman was guilty of actionable negligence.

It is the general rule that it is the duty of the master to exercise ordinary care to provide a reasonably safe place in which the servant may perform his service. Railway Co. v. Jarvi, 53 Fed. 65, 3 C. C. A. 433, 10 U. S. App. 439. But this rule cannot be justly applied to cases in which the very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses. The duty of the master does not extend to keeping such a place safe at every moment of time as the work progresses. The servant assumes the ordinary risks and dangers of his employment that are known to him, and those that might be known to him by the exercise of ordinary care and foreseight. When he engages in the work of making a place that is known to be dangerous, safe, or in a work that in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses, the hazard of the dangerous place and the increased hazard of the place made dangerous by the work are the ordinary and known dangers of such a place, and by his acceptance of the employment the servant necessarily assumes them. Armour v. Hahn, 111 U. S. 313, 318, 4 Sup. Ct. 433; City of Minneapolis v. Lundin, 58 Fed. 525, 529, 7 C. C. A. 344, 19 U. S. App. 245; Railway Co. v. Jackson, 12 C. C. A. 507, 65 Fed. 48. In Armour v. Hahn, supra, the foreman of the carpenters at work upon a building in process of erection directed two of them to push a joist out to the end of timbers which rested upon and projected 16 inches beyond the wall of the building. One of the carpenters in obeying this order stepped on the projecting part of one of the timbers, which tipped up, and he fell, and was injured. Mr. Justice Gray, in delivering the opinion of the supreme court, said:

"There is no evidence tending to prove any negligence on the part of the firm of which the defendant was a member, or of their superintendent, or of the foreman of the gang of carpenters. The obligation of a master to provide reasonably safe places and structures for his servants to work upon does not impose upon him the duty, as towards them, of keeping a building, which they are employed in erecting, in a safe condition at every moment of their work, so far as its safety depends upon the due performance of that work by them and their fellows."

In City of Minneapolis v. Lundin, supra, a servant was hurt while at work in the construction of a sewer, because the place in which he was injured had been made dangerous by the prosecution of the work. This court declared that:

"The comparative safety of the place where each man worked was necessarily constantly varied by the progress of the work, and the duty of the master did not extend to keeping every place where each workman labored safe at every moment of its progress."

And in Railway Co. v. Jackson, supra, a servant was employed by a railroad company to assist in taking up and removing a railroad

track in the night to save the railroad from the encroachments of a flood in a river. He was injured by the stumble and fall of a co-workman over some obstruction on the surface of the ground, as they, with others, were hurriedly carrying a rail away from the dismantled track. He complained that the company was negligent in furnishing a safe place, because it had not sufficiently lighted the place in which he was working, and had permitted the surface of the ground to be covered with unnecessary obstructions. But this court held that the doctrine of "safe place" had no application to this case, and declared that:

"It frequently happens that men are employed to tear down buildings or other structures, or to repair them after they have become insecure, or, it may be, that the work undertaken by the employé is of a kind that is calculated to render the premises or place of performance for the time being to some extent insecure. In cases such as these the servant undoubtedly assumes the increased hazard growing out of the defective or insecure condition of the place where he is required to exercise his calling, and the doctrine above stated cannot be properly applied."

These cases warrant the instruction given by the court below. Austin and Finalyson were engaged in stoping out ore and timbering the space opened by the stoping. The blasting necessarily made the place opened by it insecure. There was constant danger of the fall of material loosened by the blast. The mass which fell was not visible or dangerous until the morning blast disclosed it. Not only this, but it was probably the very work of making this place safe, that Finalyson himself performed, that was the immediate cause of the accident. The gouge had resisted the efforts of workmen with picks, but it was doubtless loosened from its place by the jarring of the foot wall upon which it rested by Finalyson's drilling. It was not the negligence of the company or its foreman, but the necessary progress of this work, that made the place dangerous, and the dangers from the fall of these loosened materials, which some one must take in order that the timber should be placed in the mine at all, Finalyson voluntarily assumed when he entered upon this employment.

The case of Railway Co. v. Jarvi, 3 C. C. A. 433, 53 Fed. 65, 70, cited by appellant, was not of this character. In that case a miner, who was working about a hundred yards from the place in which he was injured, went out through a passageway to get a car, and was injured by a rock which fell from the roof of the slope as he was passing under it. It was necessary for him to pass under this roof to get his cars and to go to and from his work. The railway company knew that this roof was composed of treacherous rock, and that it was a roof that might possibly fall and that needed watching. The only way such a roof could be properly tested was by sounding it with the hand or with a pick or cane, and there was no evidence that this roof had been so tested for weeks. Upon this state of facts this court held that there was some evidence of negligence on the part of the company, and applied to the case the rule of "safe place." But the roof which fell in that case had long been completed by the railway company, and was furnished to Jarvi as a safe cover for a way through which his duties required him to pass. He had no work to perform in making it safe, or in changing the character for safety in

which the company furnished and maintained it.   On the other hand, in the case at bar Austin and Finalyson were engaged in removing ore from the breast of the stope, and in making the place from which it was removed safe for subsequent work.   The very timbering upon which Finalyson was engaged was the work of making a place safe that was necessarily made dangerous by the progress of the work. The complaint in this case is that the master was negligent because it did not, before Finalyson commenced to timber, safely timber and make safe a place necessarily made dangerous by the progress of the work, which it had employed Finalyson himself and his fellow servants to make safe.   In other words, the complaint is that the master was negligent because it did not render unnecessary the work it employed the servant to do, before he commenced to do it.   The distinction between this and the Jarvi Case is marked and clear, and in our opinion it brings it squarely within the other class of cases to which we have already referred.  ·

There is another reason why this case is not ruled by the Jarvi Case, and it is that this record discloses no evidence of negligence of the company or its foreman that would warrant a verdict.   The negligence which charged the railway company in the Jarvi Case was its failure to inspect and sound with the hand or with a pick or cane the roof of a finished way through which its employés were constantly passing.   There was no such negligence in the case at bar.   Both the foreman and the man who was engaged in blasting tested with a pick the mass which fell upon Finalyson, and strove vigorously but in vain to bring it down, within an hour of the accident that befell him.   It is only an injury that could have been foreseen and reasonably anticipated as the natural and probable result of an act of negligence that is actionable.   Railway Co. v. Elliott, 5 C. C. A. 347, 55 Fed. 949; Railway Co. v. Kellogg, 94 U. S. 469; Hoag v. Railroad Co., 85 Pa. St. 293, 298, 299.

Who that had tried with a pick to break off from the foot wall and bring down this 1,200 pounds of earth, and had tried in vain, could have reasonably anticipated that it would fall of its own weight within an hour?   It is true that one witness, Austin, says that he was not satisfied with the trial, and thought it might fall at any time, but he testifies that he did not after the trial make this statement to the foreman nor to Finalyson.   The following is a portion of his cross-examination:

"Q. From the time you went there, one o'clock to two o'clock, what were you doing? A. I was picking down the shot. Q. Trying to get this mass down, and did not succeed? A. Yes; and Mr. Talbert. Q. How long did Mr. Talbert work at it trying to get it down? A. A minute or so. Q. And could he get it down? A. No, sir. Q. What did Mr. Talbert say about it, now? A. He says, 'There is lots of time; if we shoot that we lose this smelting ore that is alongside of it.' Q. What else? A. Then we started. Q. I mean is that all he said then? A. That is all he said then. Q. Didn't you and he discuss the question whether it was likely to fall or not? A. No, sir. Q. Nothing said about it? A. No, sir; not to my knowledge. Q. After you had tried it that way, you were both satisfied it was not likely to fall, was not you? A. No, sir; I was not satisfied, because I thought it might fall any time. Q. Did you think it was dangerous, and likely to fall then? A. Yes, sir; if I did not I would not want to put this hole in. Q. You went and sat right

down where it could fall on your body? A. Yes, sir; afterwards. Q. Although you thought at that time, it was liable to fall any time? A. I was not sitting. Q. You say there was not anything said between you it was not likely to fall after you tried it? A. No, sir; not to my knowledge. Q. You went and stood where it could fall on your body, and Talbert went and stood where it could fall on him, didn't he? A. Yes, sir."

Actions speak louder and more truthfully than words, and the acts of Austin and the foreman conclusively prove to our minds that they did not anticipate any such result as the fall of this mass of earth. They stationed themselves at work opposite and beneath it, so that if it fell it must strike their bodies, unless they could fortunately jump from under it. Finalyson evidently did not anticipate its fall. If he had, he would not have seated himself beneath it to drill a hole that was aside from it, and that he might have drilled as well from its opposite side, where the falling mass could not have struck him. After a careful perusal of all the evidence in this case, we are of the opinion that there is none here that would sustain a verdict that this company or the foreman was guilty of any negligence that a man of ordinary prudence could have reasonably anticipated would result in this injury. The judgment below is affirmed, with costs.

CALDWELL, Circuit Judge (dissenting). The majority opinion does not question the fact that Talbert, the foreman of the mine, was a vice principal of the mining company, and upon that question, therefore, there is no difference of opinion.

The first question to be decided is: What duty does a mining company owe its employés who are engaged in carrying on the work of mining, underground? This is not a new question in this court. In the case of Railway Co. v. Jarvi, 3 C. C. A. 433, 53 Fed. 65, a miner was injured by the fall of a rock from the roof of the mine, and, in affirming judgment he had recovered for the injury he received, this court, in defining the duty of a mining company to its employés, said:

"It is the duty of the employer to exercise ordinary care to provide a reasonably safe place in which his employé may perform his service. It is his duty to use diligence to keep this place in a reasonably safe condition, so that his servant may not be exposed to unnecessary and unreasonable risks. The care and diligence required of the master is such as a reasonably prudent man would exercise under like circumstances in order to protect his servants from injury. It must be commensurate with the character of the service required, and with the dangers that a reasonably prudent man would apprehend under the circumstances of each particular case. Obviously, a far higher degree of care and diligence is demanded of the master who places his servant at work digging coal beneath overhanging masses of rock and earth in a mine than of him who places his employé on the surface of the earth, where danger from superincumbent masses is not to be apprehended. A reasonably prudent man would exercise greater care and watchfulness in the former than in the latter case, and, throughout all the varied occupations of mankind, the greater the danger that a reasonably intelligent and prudent man would apprehend, the higher is the degree of care and diligence the law requires of the master in the protection of the servant. For a failure to exercise this care, resulting in the injury of the employé, the employer is liable; and this duty and liability extend, not only to the unreasonable and unnecessary risks that are known to the employer, but to such as a reasonably prudent man in the exercise of ordinary diligence—diligence proportionate to the occasion—would have known and apprehended. Cook v. Railroad Co., 34 Minn. 45, 24 N. W. 311; Hayden v. Manufacturing Co., 29 Conn. 548; Noyes v. Smith, 28 Vt. 59; Gibson v. Railroad

Co., 46 Mo. 163; Nadau v. Lumber Co. (Wis.) 43 N. W. 1135, 1137; Hutchinson v. Railroad Co., 5 Exch. 343; Huddleston v. Machine Shop, 106 Mass. 282; Snow v. Railroad Co., 8 Allen, 441; Sullivan v. Manufacturing Co., 113 Mass. 396; Ryan v. Fowler, 24 N. Y. 410; Patterson v. Railway Co., 76 Pa. St. 389; Swoboda v. Ward, 40 Mich. 420."

And after stating that it is the duty of the servant to exercise that degree of care which a reasonably prudent person would employ under like circumstances in order to protect himself from injury, the opinion proceeds:

"But the degrees of care in the use of a place in which work is to be done, or in the use of other instrumentalities for its performance, required of the master and servant in a particular case, may be, and generally are, widely different. Each is required to exercise that degree of care in the performance of his duty which a reasonably prudent person would use under like circumstances; but the circumstances in which the master is placed are generally so widely different from those surrounding the servant, and the primary duty of using care to furnish a reasonably safe place for others is so much higher than the duty of the servant to use reasonable care to protect himself in a case where the primary duty of providing a safe place or safe machinery rests on the master that a reasonably prudent person would ordinarily use a higher degree of care to keep the place of work reasonably safe if placed in the position of the master who furnishes it than if placed in that of the servant who occupies it. Of the master is required a care and diligence in the preparation and subsequent inspection of such a place as a room in a mine that is not, in the first instance, demanded of the servant. The former must watch, inspect, and care for the slopes through which and in which the servants work as a person charged with the duty of keeping them reasonably safe would do. The latter has a right to presume, when directed to work in a particular place, that the master has performed his duty, and to proceed with his work in reliance upon this assumption, unless a reasonably prudent and intelligent man, in the performance of his work as a miner, would have learned facts from which he would have apprehended danger to himself. Russell v. Railway Co., 32 Minn. 230, 20 N. W. 147; Hutchinson v. Railroad Co., 5 Exch. 343; Gibson v. Railroad Co., 46 Mo. 163; Cook v. Railroad Co., 34 Minn. 47, 24 N. W. 311."

The sound doctrine on this subject is comprehensively and forcibly stated by Mr. Justice Field in delivering the unanimous judgment of the supreme court in the recent case of Mather v. Rillston, 15 Sup. Ct. 464. That was an action to recover damages for injuries sustained by the plaintiff from the explosion of powder and caps in an iron mine at Ironwood in Michigan, stored in a room in which the plaintiff was working. Expressing the duties and obligations that mine owners owed their employés, the court said:

"All occupations producing articles or works of necessity, utility, or convenience may undoubtedly be carried on, and competent persons, familiar with the business and having sufficient skill therein, may properly be employed upon them; but in such cases, where the occupation is attended with danger to life, body, or limb, it is incumbent on the promoters thereof, and the employers of others thereon, to take all reasonable and needed precautions to secure safety to the persons engaged in their prosecution; and for any negligence in this respect, from which injury follows to the persons engaged, the promoters or the employers may be held responsible and mulcted to the extent of the injury inflicted. The explosive nature of the materials used in this case, and the constant danger of their explosion from heat or collision, as already explained, was well known to the employers, and was a continuing admonition to them to take every precaution to guard against explosions. Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted at all without all reasonable precautions against such

dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger there must be used all appliances readily attainable known to science for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence. If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of. So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers and suffer in consequence, the employers will also be chargeable for the injuries sustained. Both of these positions should be borne constantly in mind by those who engage laborers or agents in dangerous occupations, and by the laborers themselves as reminders of the duty owing to them. These two conditions of liability of parties employing laborers in hazardous occupations are of the highest importance, and should be in all cases strictly enforced."

The doctrine that a mining company can send its employés into the bowels of the earth to conduct its mining operations without making any provision for the proper supervision and inspection of the mine for the security and protection of the miners and the mine is unsupported by authority, is opposed to sound public policy, and is cruel and inhuman. Miners do undoubtedly take upon themselves all the usual and ordinary risks of the business; but what are these ordinary risks? They are the risks incident to the business when it is conducted by the mine owner according to the customary and approved methods and with due regard to the safety of the miners. The neglect of the mine owner to discharge his duty in this regard is not one of the risks assumed by the miner, but is a negligent act on the part of the mine owner which renders him liable in damages to any miner injured thereby. It is the duty of the mine owner to provide a competent foreman or inspector to superintend the working of the mine; it is the duty of this foreman to direct the miners when and where to work; and it is particularly his duty to make timely inspection of the timbers and walls and roof of the mine in order that no harm may come to the miners from causes which a capable and diligent inspector would discover, and, when discovered, remove or cause to be removed. Where blasts are used in a mine, it is the imperative duty of the foreman to be diligent in discovering the effect of the blast upon the timbers, walls, and roof of the mine, and to point out to the miners any dangerous conditions resulting from the blast, and to cause these conditions to be removed without delay, by proper appliances and with as little danger to the men as practicable. Mining is a necessary and permanent business, and must be conducted in an intelligent, orderly, and systematic manner, not alone for the protection of the miners, but for the preservation of the mine itself. For these reasons, the business must have an intelligent and competent head. The necessity for this is imperative. When properly conducted, there is no pursuit in the country carried on with greater regularity, system, and order, and with a stricter observance of rules intended to se-

cure employés against accidents and property from loss or dam-
age. The conditions confronting the miners from day to day, as a
rule, are neither unexpected nor unusual. They are the common and
expected incidents of mining, and when the foreman does his duty
they are provided for and met without accident or any special dan-
ger. There is nothing hasty or haphazard about the business. In
the Encyclopedia Britannica (9th Ed.) tit. "Mining," it is said:

"In spite, however, of all the dangers to which miners are exposed, they
are less likely to be the victims of accident than railway servants, among
whom the rate of fatal accidents varies from 2.5 per 1,000 on passenger
traffic lines, to 3.5 per 1,000 on lines possessing a heavy goods traffic."

The error of the majority of the court in likening the customary
work in a mine to the sudden calling out of men to work after night
on the brink of a rapidly rising river, whose bank is caving, to save
property from destruction by the flood (Railway Co. v. Jackson, 12
C. C. A. 507, 65 Fed. 48), and other like cases, is too obvious to re-
quire discussion. Upon the law applicable to this case the ma-
jority opinion is in direct and palpable conflict with the opinion of
this court in the case of Railway Co. v. Jarvi, supra, and of the
supreme court in the case of Mather v. Rillston, supra, both of
which were mining cases, and which lay down the rules applicable
to the case at bar. In the case of Railway Co. v. Jarvi, supra, the
plaintiff was injured by the fall of a rock from the roof of a mine,
and this court held it was a question for the jury to determine
whether the company was negligent in not discovering by timely
inspection the dangerous character of this rock, and removing same,
and the jury found a verdict for the plaintiff, and this court re-
fused to disturb that verdict.

The facts of this case disclosed by the record, and material to
its decision, are not very voluminous, and the material parts of the
testimony will be fully set out in the very language of the only wit-
ness who was called to testify to the transaction. This is rendered
necessary to correct what I conceive to be a total misconception of
the facts in the opinion of the majority of the court. At the time
and place of the accident there were present only three persons,
namely: Finalyson, who was fatally injured by the accident, the
miner Austin, and the defendant's foreman, John Talbert. Fin-
alyson's voice is hushed in death, and the defendant declined to
put its foreman on the stand, so that on the question of the de-
fendant's negligence, the case rests solely on the testimony of the
witness Austin and the attendant circumstances. In his examina-
tion in chief Austin testifies as follows:

"Q. You may state what you were doing in that level just the day of
the accident. A. Well, in the forenoon I was drilling a hole, and shot it
at dinner time. After I come back after dinner, it opened up some gouge.
That left it on the footwall, and it remained there that I could not pull it
down. Mr. Talbert came along after I had just all my stuff, the quartz,
picked down, he come along. I was just about going to get my drills and
hammer for to put in a hole in this gouge, when he come along. I says
to him, 'That is a treacherous looking chunk, Jack.' John was his name.
And I was going to put the hole in, and he says, 'You get that down.' I
told him— Took the pick, tried it; could not get it down. Well, he says,
if we would shoot this down, we would lose this smelting ore; that was

above it. I said no more. So within about twenty minutes, I judge, Mr. Finalyson came along, and he says, 'John, where am I going to cut this hitch, set it along, so as to leave those stulls level with the rest of the level?' and he says, finally, 'On the footwall, just about there.' Mr. Finalyson went to work, and he scraped down off of this pile of dirt I had shot down, and he made a kind of a seat for himself so as to sit down to cut this hitch. He was working there, and I was sacking up ore, and Mr. Talbert was standing in between the two of us. I was sitting down, and Mr. Finalyson was sitting down, and Mr. Talbert was standing up in between us, pulling the chunks of ore in with his candlestick. I was sitting down at the time the chunk fell on Mr. Finalyson,—the body of it,—and one end of it fell on my knee; hurt me three or four days. The other end he got most of the weight. He got it all; bruised him right down on his knees; and Mr. Finalyson, all he said was, 'Take me out of here.' He says, 'I am killed.' Q. Who is this Mr. Talbert, or Jack, you refer to? A. That is the foreman,—underground foreman. Q. How long had Finalyson been at the point where the fall occurred before the gouge fell? A. He was about half an hour,—twenty minutes,—when the chunk fell on his back. Q. When you spoke of putting in a hole there— In the first place, what do you put a hole in for? A. I put it in to take this chunk down. Q. What is the practical use of this hole? What is it for? A. To shoot; in order to take this chunk down, to make himself safe. Q. You put in powder in the hole, is that the idea? A. Yes, sir; after I get it drilled. Q. Why did you want to put in this hole in this particular place? A. Because it was a chunk of gouge on the footwall. A chunk of gouge, as I was standing on this below, might catch my feet, and as it was liable to smash my legs from my knees down. I thought it might let go, and roll on to my limbs, and break them. Q. At what time would you say that day had this gouge been disclosed; what hour of the day had this gouge shown up? A. Well, it showed up— I shot at dinner, and tallied, as we all do; and after dinner I came down, and this gouge was shown up on the footwall. I picked all down but this gouge that was on the footwall. I could not get it down with a pick. I was going to shoot it down. Q. And when did you call Mr. Talbert's attention to it? A. I would judge it would be about two o'clock, as near as I can judge. Q. What was this gouge? A. Well, it was part of the vein filling. Q. What was it composed of? A. It was composed of soft, sticky mud, and little bits of quartz, and in among it, mixed in among it, they claim it was good mill ore. Q. Why didn't he (Finalyson) jump out of the way? A. He had his back to it; he didn't see it come until it fell on him. Q. Was it necessary for him, in order to cut that hitch? A. He had either to sit down or kneel; he could not stand up. Q. What was the purpose of cutting that hitch? A. For to put in the stull for to lag over; so as to lag the drift over. Q. What do you mean by lagging over? A. I mean for to cover the drift closed in. Q. Why did they want to lag it over? A. For to make it safe for men to come along in the drift. Q. I will ask you then what he said, if you recall,—what Talbert said to Finalyson when he came there. A. The words he said—Mr. Finalyson says to Mr. Talbert, 'Where do you want that hitch cut?' Mr. Talbert sighted along from the rest of the stulls, so as to get a level for to have this stull level with the rest of the stulls that he had put in. He showed him the spot on the footwall, where he had to cut this hitch. That left Mr. Finalyson with his back against this chunk. Q. I understood you to say that he showed him the spot to cut this hitch? A. Yes, sir." On the cross-examination he 'testified as follows: "Q. And when you went back at noon after firing out the shot, you observed this gouge, as you called it, of clay? A. Yes, sir. Q. Was it clay or ore, or clay mixed with ore? A. It was part of the vein. Q. Part of the vein? A. Yes, sir. Q. When you came back there did you examine to see what the effect of that shot was? A. Yes, sir. Q. What did you observe in respect to that gouge? A. I observed that it was a chunk that might drop away from the rest of the body of ore, any minute, and fall on the— Q. What did you do in respect to it? A. I was going to put in a hole only for Mr. Talbert coming along. Q. I asked you if you did anything in respect to it? A. I tried to take it down, and I could not. Q. What did you try to take it down with? A. A pick. Q. It would not

come down? A. No, sir. Q. Did you observe any seams in it? A. I did not, any more than it was a heavy chunk; it might let go any minute. Q. Your idea being of the chunk that it might let go any minute, you were going to shoot it down? A. Yes, sir. Q. Who came there first, Mr. Finalyson or Talbert? A. Mr. Talbert. Q. What did you say to him, and what did he say to you? A. I says to Mr. Talbert, 'That is a treacherous looking chunk, and I was thinking about putting a hole to shoot it down'; showed him where I put the hole. Q. What did Mr. Talbert say in reply? A. He says, 'You can get that down.' I told him I could not, and he tried. 'Well,' he says, and he tried it; he could not get it down. Q. Did he try it? A. He tried it. Q. How did he try it? A. Tried it with a pick. Q. Did he try it with anything else? A. No, sir. Q. How long did he work at it to get it down? How long did you work at it? A. I worked quite a little while; got a bit of the corner off myself. Mr. Talbert had not tried very long. He says to me then, 'There is lots of time.' Q. How long did Mr. Talbert work at it trying to get it down? A. A minute or so. Q. And could not get it down? A. No, sir. Q. What did Mr. Talbert say about it now? A. He says, 'There is lots of time; if we shoot that, we lose this smelting ore that is alongside of it.' Q. After you had tried in that way, you were both satisfied it was not likely to fall, was not you? A. No, sir; I was not satisfied, because I thought it might fall any time. Q. Did you think it was dangerous and likely to fall then? A. Yes, sir; if I did not, I would not want to put this hole in. Q. Finalyson went and sat down? A. Finalyson didn't try it at all, to my knowledge. Q. How long had he been at work when he was hurt? A. You mean right there? Q. Yes. A. About half an hour. Q. Where was Mr. Talbert all the time? A. Standing right beside of us. Q. Did he stay there the half hour while he was at work? A. Yes, sir. Q. Do you know whether Mr. Finalyson examined for himself that chunk before he commenced to work? A. No, sir. Q. Do you know whether he and Mr. Talbert discussed the question of the safety before he commenced to work? A. I don't think they did. Q. I didn't ask you what you thought; I asked you whether you knew whether they did or not? A. I didn't hear it."

It will be observed that the witness testifies positively, and repeats the statement three different times, that he told the foreman that this gouge was a dangerous chunk, and likely to fall at any time, and should be taken down, and wanted to shoot it down, and would have done so but for the foreman's interference and orders. The witness says, "I says to him, 'that's a treacherous looking chunk.'" Again he says, "I called Mr. Talbert's attention to it about two o'clock, as near as I can judge"; and a third time he says, "I says to Mr. Talbert, 'That's a treacherous looking chunk, and I was thinking about putting a hole to shoot it down.'" In the light of this testimony, it is not perceived where the majority of the court finds any sanction for the statement that, while Austin testified he thought the gouge "might fall at any time," "he testifies that he did not at the time make this statement to the foreman." That is precisely what he did do, and he testifies to the fact three times over. He did not make the statement to Finalyson because he came up after Austin and the foreman had their conversation on the subject. It is established by the testimony of an unimpeached witness that this gouge was a treacherous looking chunk, and likely to fall any minute; that this fact was communicated to the foreman; and we have, in addition, the indisputable fact that it did fall in a few minutes. The summary and extraordinary way in which the majority of the court seek to avoid the force and effect of Austin's testimony is without precedent in an appellate court: "Actions," say the majority of the

court, "speak louder and more truthfully than words, and the actions of Austin and the foreman conclusively prove to our minds that they did not anticipate any such result as the fall of this mass of earth." From the beginning to the end of his testimony, the witness Austin testifies with the utmost fairness and candor, and the assault of the majority of the court on his veracity is without any grounds whatever to support it. But, if one thing is better settled than another in our system of jurisprudence, it is that the jury, and not the judge, are the exclusive judges of the credibility of the witnesses. Another rule equally well settled is that a court cannot withdraw a case from the consideration of the jury if, by giving full faith and credit to the plaintiff's testimony, it fairly tends to support his cause of action. Never before in the history of jurisprudence in this country has an appellate court refused to give effect to these two fundamental rules, when the question was whether the cause should be withdrawn from the consideration of the jury. But the statement of the opinion is as false in logic as it is unsound in law. The indifference of a master to his own safety gives him no right to negligently endanger the lives of his servants. If, therefore, the foreman did negligently place himself in a position of danger, that was no excuse or justification for negligently placing Finalyson in a like position of danger. Finalyson not having heard the conversation between Austin and Talbert, and not knowing the danger, was put to work by Talbert in a position where he must inevitably be crushed, if the "treacherous chunk" fell; but Austin and Talbert took care to occupy positions where, if it did fall, they could escape from injury, as they did, Austin escaping with a slight bruise on his knee, and Talbert without a scratch. It is manifest from the evidence that, if the foreman had exhibited the same regard for the safety of Finalyson that he did for himself, Finalyson would not have been injured. If it be true, as asserted by the majority of the court and the defendant company, that the foreman "did not anticipate any such result," why was he not called as a witness to testify to that fact? The fact that he was not called justifies the presumption that, if he had been, his testimony would not have supported the present contention of the majority of the court and the defendant, but would have corroborated the plaintiff's witness, Austin. Railway Co. v. Ellis, 4 C. C. A. 454, 54 Fed. 481; 1 Starkie, Ev. 54; Com. v. Webster, 5 Cush. 295, 316; People v. McWhorter, 4 Barb. 438.

The majority of the court deny that it is a question of fact for the jury, and lay it down as a rule of law that the foreman of a mine, having knowledge of a gouge or threatening mass protruding from the wall of a mine, brought out by a blast, is not required to resort to any other tool or agency than a "pick" to dislodge such threatening mass, and that, if it cannot be dislodged with a pick, then he is not guilty of any negligence by suffering it to remain at a place where the miners are liable to be injured or killed by its fall. Fortunately for humanity and for miners, this rule of the majority of the court will not be observed by any prudent foreman. A pick is but one, and the least, and most inefficient, of the many agencies and instruments that may be brought into requisition on such occasions. En-

cyclopedia Britannica (9th Ed.) tit. "Mining." When the foreman's attention was called to this "treacherous chunk" on the wall, it was therefore plainly his duty to use reasonable care and diligence to remove it before setting men to do other work in its vicinity, and who would be injured by its fall. Whether he did exercise such care was a question of fact for the jury to determine. It is said in the majority opinion that he tested it with a pick, and it did not fall. When the pick proved insufficient to remove this treacherous mass, then it became his duty to shoot it down, as Austin was preparing to do when he stopped him, or to resort to some other adequate means for the purpose. He contemplated removing it some time, for, when urged by Austin to shoot it down then, he replied, "There is lots of time; if we shoot that we lose the smelting ore that is alongside of it"; but the trifling amount of ore was not saved, and Finalyson's life was sacrificed. It is said in the majority opinion that "the complaint in this case is that the master was negligent because it did not, before Finalyson commenced to timber, safely timber and make safe a place necessarily made dangerous by the progress of the work which it had employed Finalyson himself and his fellow servants to make safe." This is a cogent statement of a purely imaginative case. It certainly is not a statement of what the plaintiff claims or what the proof establishes. What the plaintiff claims is that it was the foreman's duty, after the explosion of the blast, to ascertain, by an intelligent and careful inspection, the condition of the walls and roof of the mine where the explosion took place, and to "shoot down" or otherwise remove any gouges or lumps on the walls or roof brought into view by the explosion, which were likely to fall and injure the miners; that this treacherous looking lump was brought into view by the explosion; that the foreman saw it, and his attention was specially called to its dangerous character by Austin, who would have shot it down but for the foreman's interference. Upon these indisputable facts, the plaintiff's claim is that a reasonably careful and prudent foreman would have caused this dangerous gouge to be removed before putting Finalyson, who was ignorant of the danger, at other work near enough to the gouge to be injured by its fall. No one was working to get this gouge down at the time it fell, nor preparing to guard against danger from it by timbering or otherwise, for the foreman intended to take it down when he got ready. All efforts to get it down for the time being had been stopped by the direction of the foreman who set Finalyson at his accustomed work of timbering the mine and Austin to picking up and sacking ore. The work Finalyson was doing had no relation whatever to the gouge, which the foreman had simply postponed taking down until the ore was picked up. If Finalyson had been injured in the act of removing or assisting in removing the gouge itself, the case would have presented an entirely different question. But no one would have been injured in the work of removing the gouge, because the testimony shows conclusively that it could have been shot down with perfect ease and safety and without danger to any one. Lumps of the character of that which killed Finalyson are always removed before the timbering or other work begins, and that is what the foreman contemplated doing a little later.

Further consideration of the evidence is unnecessary. Enough has been disclosed to show without doubt that the lower court should have submitted the question of negligence to the jury. The question of negligence is one of fact, and must be referred to the jury for determination. It would be profitless to cite authorities on this point. It is enough to refer to two or three judgments of the supreme court of the United States. In the case of Railroad Co. v. Stout, 17 Wall. 657, the court said:

"* * * Although the facts are undisputed, it is for the jury, and not for the judges, to determine whether proper care was given, or whether they establish negligence."

In the case of Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118, the circuit court instructed the jury to render a verdict for the defendant upon the ground that the plaintiff had been guilty of contributory negligence, but the supreme court reversed the judgment. The court, speaking by Mr. Justice Miller, said:

"But we think these questions (of negligence) are for the jury to determine. We see no reason, so long as the jury system is the law of the land and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as this as well as others. * * * Instead of the course here pursued, a due regard for the respective functions of the court and jury would seem to demand that these questions should have been submitted to the jury, accompanied by such instructions from the presiding judge as would have secured a sound verdict."

In the case of Railway Co. v. Ives, 144 U. S. 409, 417, 12 Sup. Ct. 679, the court said:

"It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court."

See Railroad Co. v. Foley, 3 C. C. A. 589, 53 Fed. 459.

On the question of the defendant's negligence the opinion of a majority of the court does not, in my judgment, express the conclusion "all reasonable men," or any considerable number of such men, would draw from the evidence in the case. The question is one of fact, which neither the majority nor the minority of this court is empowered to decide. The constitutional mode of ascertaining the sense of reasonable men on disputed questions of fact in common-law actions is by the verdict of 12 jurymen, and not by the opinions of the judges. In their deliberations the jury exercise their common sense, and bring to the solution of the questions submitted to them their practical experience and knowledge of human affairs which afford a much better guaranty of a sound conclusion than the technical, subtle, and hair-splitting methods, that not unfrequently creep into the administration of the law by the judges. It was because the people knew the judges were poor judges of the facts that they committed their decision to a jury, and every day's experience confirms the wisdom of their action. The plaintiff has a constitutional right to have the facts of her case tried by a jury. The judgment of the circuit court should be reversed, and the cause remanded, with directions to grant a new trial.