## SOUTHERN PAC. CO. v. YEARGIN.

(Circuit Court of Appeals, Eighth Circuit. April 24, 1901.)

No. 1,440.

1. MASTER AND SERVANT—ACTION FOR DEATH OF SERVANT—PROXIMATE CAUSE.

Plaintiff's intestate, who was engineer of a passenger train on defendant's railroad, was killed in a collision with an engine which was used as a helper to assist in pushing heavy trains up a grade between two stations, after which it backed down to the station from which it started. It was while so backing down in the nighttime, with no headlight on its rear end, but with an ordinary lantern hung over the rear of the tender, about five feet above the track, which could be seen but a short distance, that it met the passenger train, and the collision occurred, at a point where the track was straight, and the view unobstructed for a distance of a mile or more in either direction. The train was on its regular time, and it was the duty of the engineer of the helper engine to remain at the upper station until it had passed, but he had received a message from the train dispatcher which he understood to mean that the train was more than an hour late. *Held*, that the question whether his negligence in failing to construe the message properly was the sole proximate cause of the collision, or whether the failure of defendant to equip its engine with a proper headlight was a contributory cause, which would render defendant liable for the death of the deceased, under the circumstances shown, was one for the jury, and could not properly be determined by the court as a matter of law.

2. SAME—ASSUMED RISKS.

The testimony tended to show that the engineer of a passenger train had knowledge that two helper engines of his employer were in the habit of running backward on the main track between two stations

without a headlight at the rear of the tender, and that he was killed in a collision with one of such engines while it was so running backward. *Held*, in an action to recover damages occasioned by his death, that the court properly declined to instruct the jury that if deceased was aware that such helper engines were not provided with the customary headlight when running backward, then he had assumed the risk incident to such defect of equipment, and could not recover. *Held*, further, that merely because of the deceased's knowledge of the defect in equipment he could not be said to have assumed the risk of injury incident thereto; the true test being whether such defect rendered the peril of continuing in the defendant's service so imminent that he ought to have quit, and whether he acted with ordinary prudence in continuing in its employ, notwithstanding the fact that the equipment of the two helper engines was insufficient.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Utah.

Thomas T. Fauntleroy (C. H. Fauntleroy and Alphonso Howe, on the brief), for plaintiff in error.

Charles S. Varian (Charles S. Zane, Lindsay R. Rogers, and W. R. White, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This is a suit for personal injuries. The accident which resulted in the death of T. J. Yeargin, the plaintiff's husband, occurred on the night of February 28, 1899, at a point about one mile east of Hot Springs, in the state of Nevada, on the line of a railroad which was owned and operated at the time by the Southern Pacific Company, the plaintiff in error, which was the defendant below. The circumstances attending the death of the plaintiff's husband were as follows: He was an engineer in the employ of the defendant company, and was operating an engine attached to an east-bound passenger train on the defendant's road, which, when on time, passed through Hot Springs at 10:53 p. m., but was not scheduled to stop at the latter station. About one mile east of Hot Springs, while his train was running at a speed of about 30 miles per hour, it came into collision with what is known as a "helper engine" belonging to the defendant company, which was running backward from a station known as "Mirage," which was about 6 miles east of Hot Springs. The helper engine, although on the main track of the defendant's road, was not provided with a headlight at the rear end of the tender, but in lieu thereof an ordinary lantern was suspended at the rear end of the tender, at a point about five feet above the surface of the rail. The contention on the part of the plaintiff below was that the collision was occasioned in part, at least, by the insufficient equipment of the helper engine, in that the usual headlight was not attached to the rear end of the tender, as it should have been, when the engine was running backwards upon the main track. The record discloses that the station above mentioned known as "Mirage," is considerably higher than Hot Springs, and also higher than a station known as "White Plains," which is the next station east of Mirage; that, for the purpose of helping trains over the high elevation between

Hot Springs and White Plains, the defendant company at the time of the accident, and for many years previously, kept two helper engines at Hot Springs to assist passenger and freight trains over the divide; that, when one of these helper engines was attached to the rear end of a train, it would often be uncoupled at Mirage, which was about at the summit of the divide, instead of going through to White Plains, and would then run backwards to Hot Springs, there being no turntable or Y at Mirage by means of which the helper engine could be turned. On the night of the accident one of these helper engines, in charge of an engineer by the name of Shriver, left Hot Springs very shortly after 10 p. m. to help an east-bound freight train over the divide. At Mirage he uncoupled his engine from the freight train and started back to Hot Springs, and when about a mile east of Hot Springs came into collision with the east-bound passenger train; the result of the collision being that the plaintiff's husband, who was the engineer on that train, was killed, as well as two firemen, namely, the fireman on the passenger engine and the fireman on the helper engine. The time usually consumed by a helper engine in assisting a train upgrade to Mirage and returning to its post on the side track at Hot Springs was about 35 or 40 minutes, on the average, Mirage being, as above stated, only about six miles distant. It seems that shortly before Shriver left Hot Springs, on the night of the accident, to assist the freight train over the divide, he was shown a telegram from the train dispatcher of the defendant company to the effect that "2nd No. 1" would run 1 hour and 15 minutes late from a place called "Wadsworth," which seems to have been west of Hot Springs, to Lovelocks, a station some distance eastwardly from Hot Springs. This dispatch, if interpreted as the train dispatcher intended that it should be interpreted, indicated that east-bound train No. 1, which was due at Hot Springs at 10:53 p. m., was running in two sections, and that the second section of the train was an hour and 15 minutes late. Because no mention was made of the first section it was expected that Shriver and other employés of the defendant company to whom the dispatch was shown would understand that the first section of the train was very nearly on time. Shriver for some reason misinterpreted or misunderstood the order of the train dispatcher, and, instead of taking the side track at Mirage to await the passage of the first section of the passenger train, he started back to Hot Springs, and came into collision with the first section of the passenger train, in the manner heretofore explained.

The exceptions which were taken on the trial to the admission and exclusion of evidence have been considered, but they are not of sufficient importance to require comment, and we shall accordingly direct our attention to certain propositions of law embodied in the instructions which the trial court declined to give, and with respect to which action error is assigned by the defendant company.

The first instruction which was asked by the defendant, and was refused, was an instruction to the effect that under the evidence the plaintiff below could not recover. The proposition urged in support of this instruction is that, in view of the undisputed facts in

the case, the sole proximate cause of the collision was the act of the engineer Shriver, a fellow servant of the deceased, in running the helper engine back from Mirage to Hot Springs on the time of the first section of the passenger train. The learned judge of the trial court took a different view of the case, holding, in substance, that it was the province of the jury to decide what was the proximate cause of the accident, and that, although Shriver may have been at fault in misconstruing the order of the train dispatcher and in running back on the main track, yet there was evidence from which a jury might find that the neglect of the defendant to provide headlights for its helper engines when they were running backwards on the main track was a proximate contributing cause of the injury, for which the defendant might be held responsible. We are to determine which of these views is correct. Mr. Justice Strong, speaking for the supreme court of the United States, said in Railway Co. v. Kellogg, 94 U. S. 469, 474, 24 L. Ed. 256, 259:

"The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or legal knowledge. It is to be determined as a fact in view of the circumstances of fact attending it."

In the present instance, therefore, the jury had the right to determine whether the failure of the defendant company to provide its helper engines with proper headlights was so related to the collision, in view of all the surrounding circumstances, as to be esteemed one of the proximate causes thereof, unless it can be said that there was no evidence in the case which would lead a reasonable mind to that conclusion. The testimony tended to show that the track of the defendant's road was straight, and that there were no intervening objects to obstruct the view for at least $2\frac{1}{2}$ miles east of Hot Springs; that the track for that distance crossed an alkaline desert; that it was a windy night and that there was much dust in the air; that an ordinary headlight, such as is usually used on locomotives, could have been seen under such conditions as prevailed that night, and recognized as a headlight, for at least two miles, whereas the lantern that was suspended at the rear end of the tender, and only 5 feet above the track, might not have been visible on such a night for a distance of more than 250 yards; and that such a train as the deceased was handling, running at a speed of 30 miles an hour, could not have been stopped within the latter distance, and probably could not have been stopped short of a quarter of a mile. In the light of such surrounding circumstances, we think that the jury might well have concluded, as they appear to have done, that if a headlight had been attached to the rear end of the tender of the helper engine, instead of an ordinary lantern, which could only be seen for 250 yards, and might not then have been recognized as being on a moving locomotive, the deceased would have seen the approaching engine, and would have stopped his own train in time to have prevented any serious consequences, and that, in the line of causation, the absence of a headlight on the tender stood next to the collision, and was one of the efficient causes thereof. It is said, however, that the accident would not have occurred but for

the act of Shriver in running his engine back from Mirage to Hot Springs on the time of the passenger train, and that for this reason the want of a headlight ought not to be regarded as one of the causes of the collision, so as to render the defendant company liable. The same line of reasoning would excuse the company from responsibility for neglecting to equip any of its locomotives with headlights. It might be said that if train orders are properly given and understood, and if established regulations for the movement of trains are carefully observed, it would never happen that two trains moving rapidly in opposite directions would meet on the same track between stations. All orders given and all regulations made by railroad companies are designed in part, at least, to prevent such occurrences or accidents. But railroad companies do not act on the theory that orders and regulations will be observed invariably. They recognize the fact that mistakes will occur; that improper orders may be given, or that they will not be properly understood; and that occasionally some one will fail to comply with standing rules and regulations. Hence, as a further precautionary measure, it is the practice to equip engines with powerful headlights, to give timely warning that they are approaching, as well as to disclose obstructions on the track. When orders and regulations fail to be effective, and when by neglect on the part of some person, or by sheer accident, a train or an engine finds itself in a place where it ought not to be, the headlight often gives effective warning of danger and prevents collisions. Railroad companies themselves recognize this fact, and equip their engines accordingly. Moreover, in the present instance it is to be observed that the helper engines which were stationed permanently at Hot Springs were expected to run regularly from Hot Springs to White Plains, a distance of 15 miles, over the main track, and to run backward as often as they ran forward, since there was no turntable or Y either at White Plains or Mirage. There was as much need, therefore, that these helper engines should have a powerful headlight at one end as at the other. In view of these considerations, we accordingly hold that it was the province of the jury to say whether the absence of a headlight at the rear end of the tender was or was not a proximate cause of the collision. The facts and circumstances attending the collision were not of such a nature as authorized the court to determine, as a matter of law, what was the efficient cause of the accident.

The trial court was further asked to give an instruction which embodied the following proposition of law, namely: That if the deceased knew, or had been in the defendant company's employ so long that he ought to have known, that the defendant's standing rules and regulations only required a lantern showing a white light to be suspended at the rear end of the tender of an engine when it was moving backward in the nighttime, then, by remaining in the defendant's service with knowledge of such regulation and the danger that it involved, he assumed the risk incident to the fact that the helper engines stationed at Hot Springs were not provided with headlights at the rear ends thereof, and that, having assumed the danger incident to that defect of equipment, he could not recover. Con-

cerning this instruction, it may be said in the first place that the regulation referred to was not intended, as we think, to apply to engines of the defendant company which were employed, as these helper engines were, to run backward regularly for long distances on the main track. It had reference, most likely, to engines employed in the immediate neighborhood of stations. As before remarked, there was as great need of a headlight at one end of these engines as at the other, in view of the service in which they were employed. But we are of opinion that the instruction enunciated an unsound rule of law, for other reasons. If the doctrine which the defendant company invokes was applied in the form proposed, it would enable employers to avoid the performance of the duty which they plainly owe to their employés to exercise reasonable care in providing them with tools, machinery, materials, and appliances which are in an ordinarily safe condition, and reasonably adapted to the uses to which they are to be applied. If the rolling stock or track of a railroad company or the machinery of a large manufacturing plant gets out of repair in some respect, the employés of such companies, according to the doctrine enunciated in the instruction, who become aware of such defects, must forthwith retire from the service, although the defects in such tools, appliances, or structures are not so great as to render them altogether unfit for use, or they will be held to have assumed all risk of injury by remaining in service after the defects become known. In this way, by simply declining to make necessary repairs or to supply suitable equipment or materials, and by relying on the necessity of earning a livelihood for themselves and their families, which will ordinarily compel most of their operatives to retain their positions, the duty which the law devolves on the master can be avoided easily, and the risk of injury incident to defective tools and appliances be cast upon the servant. Such a doctrine is not only unjust to employés, but it might prove a source of great inconvenience to employers. The exigencies of business sometimes compel the temporary use of machinery or appliances which have become defective through the fault of the master. In such cases it would be unreasonable to hold that a servant who remains at his post with knowledge of the defect, and continues to work with implements which his master finds it necessary or convenient to use, thereby absolves the master from all liability for an injury which he happens to sustain. The employés of a railroad company whose track is out of repair, but not entirely unfit for use, might decline to remain in service at their own risk of injury, in which event the company would be compelled to suspend operations until its roadbed was made safe, or until it could engage a new force of operatives, who were willing to work at their own risk of life or limb. It is manifest, we think, that employés ought not in all cases to be regarded as having voluntarily assumed the risk of injury merely because they remain in service with knowledge that certain implements or appliances are out of repair, or that there is a defect in equipment. If the danger of being injured by the use of defective implements, or because of insufficient equipment, is both imminent and obvious, he who makes use of the same should not be heard to

complain. So if an employé is the first to discover a defect in a machine or other appliance, and he continues to use it without advising his employer of its condition, and is injured by so doing, it may well be said that he elected to assume the risk, and that his employer is not liable. But if the master places defective tools in the hands of his servant, or insufficient appliances, and requires him to use them, and the risk incurred by such use is not so imminent that persons of ordinary prudence would, under the circumstances of the case, decline to incur it, it would seem that the master ought not to be absolved from liability for his neglect of duty merely because the servant was aware of the defect before being hurt, and did not retire from the service. We are of opinion, therefore, that the doctrine respecting the voluntary assumption of known risks, as counsel for the defendant company sought to apply it in the present instance, was unsound, and not applicable to the facts as developed by the evidence; for even if the evidence would have warranted the jury in finding that the deceased knew that the tenders of the helper engines were not provided with headlights, and that they ought to have such equipment, yet such knowledge did not render the peril of remaining in the defendant company's service so imminent that he should have thrown up his job and sought service elsewhere. Whether he acted with ordinary prudence in remaining in the defendant's service with the knowledge which he had acquired of the insufficient equipment of the helper engines, is the true test by which to determine whether he assumed the particular risk, and released the railroad company from liability for the nonperformance of the duty to supply proper equipment which the law devolved upon it. On the state of facts disclosed by this record, the trial court had no right to withdraw this question from the consideration of the jury, as it was asked to do by the instruction. Railroad Co. v. Mares, 123 U. S. 710, 720, 8 Sup. Ct. 321, 31 L. Ed. 296; Kane v. Railroad Co., 128 U. S. 91, 94, 9 Sup. Ct. 16, 32 L. Ed. 339; Patterson v. Railroad Co., 76 Pa. 389, 394, 18 Am. Rep. 412; Ford v. Railroad Co., 110 Mass. 240, 14 Am. Rep. 598; Francis v. Railroad Co., 127 Mo. 658, 669, 28 S. W. 842, 30 S. W. 129; Shear. & R. Neg. (5th Ed.) § 211. The instruction under consideration was properly refused.

The trial court directed the jury, in substance, to determine whether the defendant company had exercised ordinary care in providing suitable equipment for its helper engines, considering the service in which they were employed. It charged the jury that Shriver and the deceased were fellow servants, and that the defendant could not be held accountable for the negligent acts of Shriver. It further charged that if the equipment of the helper engines was found to be insufficient, and that such insufficiency proximately contributed to the injury complained of, then there might be a recovery. There was no material error in the charge, so far as we can discover; and all the relevant facts of the case were laid bare before the jury, notwithstanding the action of the court in sustaining objections to certain questions which were asked by counsel for the defendant company. We think that the record discloses no error which would warrant a reversal of the judgment, and it is accordingly affirmed.

SANBORN, Circuit Judge (dissenting). It is conceded that, if there was any substantial evidence that the negligence of the railway company was the proximate cause of the injury of the engineer of the passenger train, that question was for the jury. It is, however, equally true that if there was no such evidence the question was for the court, and it was the duty of the latter to instruct the jury to return a verdict for the defendant. Railroad.Co. v. Elliott, 55 Fed. 949, 954, 5 C. C. A. 347, 352, 12 U. S. App. 381, 390, 20 L. R. A. 582; Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Scheffer v. Railroad Co., 105 U. S. 249, 252, 26 L. Ed. 1070; Jenks v. Inhabitants of Wilbraham, 11 Gray, 142; Durham v. Musselman, 2 Blackf. 96, 18 Am. Dec. 133; Morrison v. Davis, 20 Pa. 171, 57 Am. Dec. 695; Denny v. Railroad Co., 13 Gray, 481, 74 Am. Dec. 645; Dubuque Wood & Coal Ass'n v. City & County of Dubuque, 30 Iowa, 176; Hoag v. Railroad Co., 85 Pa. 293, 298, 299, 27 Am. Rep. 653; West Mahanoy Tp. v. Watson, 112 Pa. 574, 3 Atl. 866, 56 Am. Rep. 336; Read v. Nichols, 118 N. Y. 224, 23 N. E. 468, 7 L. R. A. 130; Railway Co. v. Mutch (Ala.) 11 South. 894, 21 L. R. A. 316, 38 Am. St. Rep. 179.

1. Conceding for the moment that the railway company was guilty of negligence in failing to place a headlight on the rear of the helper engine (and this was the only negligence charged), the undisputed facts conclusively prove that this negligence was neither the proximate nor the concurring cause of the accident, and that the negligence of the fellow servant,—of the engineer of the helper engine,—in disobeying his rules and placing his engine on the track on the time of the passenger train, was the sole proximate cause of the injury. This is the test: If the failure to provide the headlight could not have caused the accident without the negligence of the fellow servant, the engineer on the helper, in violating his rules, then the failure to provide the headlight was neither the proximate nor the concurring cause of the injury. The proximate or concurring cause is that cause which will naturally and probably produce the accident or result without the interposition of any new and independent cause which turns aside the natural sequence of events and produces the effect. The absence of a headlight on the back of the helper engine never could have produced a collision between this engine and the passenger engine if the new and independent cause, the negligence of the engineer in disobeying his rules, had not interposed to place the helper engine on the track on the time of the passenger train. As long as that negligence failed to intervene, the absence of the headlight was as harmless in the night as in the day time, on the side track as in the roundhouse. Railway companies establish rules which require their engineers to keep the headlights of their engines burning while they are operating them in the night. An engineer fails to comply with these rules, and the absence of a burning headlight on his engine causes an injury to his fellow servant. But the railway company is not liable for this injury, because it had the right to rely on the legal presumption that the engineer would do his duty, and would obey the rules it had established, and if he had done so the injury would not have been inflicted. Such an accident

is the result of a new and independent cause,—the omission of the engineer to obey the rules,—which the company could neither foresee nor anticipate. In the case at bar the company established positive rules which required the engineer of the helper engine to keep his engine off of the track and of the time and out of the way of the passenger train, and it informed him of the time of that train. If he had obeyed the rules, the absence of a headlight on the back of his engine could not possibly have caused or contributed to the accident which resulted. The case stands in exactly the same situation in which it would have been if the engineer had been ordered to lock his engine in the roundhouse, and in disobedience of that order he had placed it on the track in the way of the passenger train. A headlight on the rear of the engine was no more necessary to protect against a collision between the two engines, under the orders which required the engineer of the helper to keep his engine off the time of the passenger train, than it would have been if he had been required to keep it in the roundhouse. The company had the right to reckon upon an obedience to its rules, and to rely upon the fact that while these rules were obeyed the natural and probable result of the absence of a headlight on the rear of the helper engine could not produce, nor assist to produce, a collision between that engine and the passenger train; and the accident which happened could not be anticipated as the natural and probable result of the absence of the headlight. Bish. Noncont. Law, § 42, says:

"If after the cause in question has been in operation some independent force comes in and produces an injury, not its natural or probable effect, the author of the cause is not responsible."

The absence of the headlight had been in operation for years. It had never produced an accident between Mirage and Hot Springs, and it never could have produced one on the tracks of this railroad without the intervention of the new and independent negligence of the fellow servant.

Wharton says:

"Supposing that, had it not been for the intervention of a responsible third party, the defendant's negligence would have produced no damage to the plaintiff, is the defendant liable to the plaintiff? This question must be answered in the negative, for the general reason that causal connection between negligence and damage is broken by the interposition of responsible human action. I am negligent on a particular subject-matter as to which I am not contractually bound. Another person, moving independently, comes in, and either negligently or maliciously so acts as to make my negligence injurious to a third person. If so, the person so intervening acts as a nonconductor, and insulates my negligence, so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable to the person injured." Whart. Neg. § 134.

The following authorities, among others, sustain the foregoing propositions: Railroad Co. v. Barry, 84 Fed. 944, 950, 28 C. C. A. 644, 650, 56 U. S. App. 37, 47; Railroad Co. v. Elliott, 55 Fed. 949, 952, 5 C. C. A. 347, 350, 12 U. S. App. 381, 386; Finalyson v. Milling Co., 67 Fed. 507, 512, 14 C. C. A. 492, 496, 32 U. S. App. 143, 151; Railway Co. v. Bennett, 69 Fed. 525, 16 C. C. A. 300, 32 U. S. App. 621; Railway Co. v. Callaghan, 56 Fed. 988, 993, 6 C. C. A. 205, 210, 12 U. S.

App. 541, 550; Railway Co. v. Moseley, 57 Fed. 921, 926, 6 C. C. A. 641, 646, 12 U. S. App. 601, 609; Insurance Co. v. Melick, 65 Fed. 178, 184, 12 C. C. A. 544, 550, 27 U. S. App, 547, 557; Goodlander Mill Co. v. Standard Oil Co., 63 Fed. 400, 11 C. C. A. 253, 24 U. S. App. 7, 27 L. R. A. 583; Laidlaw v. Sage, 158 N. Y. 73, 98–102, 52 N. E. 679; Trewatha v. Milling Co., 96 Cal. 494, 500, 28 Pac. 571, 31 Pac. 561.

2. But it was not, in my opinion, negligence on the part of the railway company to operate this helper engine without a headlight on its rear. The company established rules which, if obeyed, rendered it impossible for the presence or absence of such a headlight to have any effect whatever upon the probability or possibility of a collision between this engine and the passenger train. It had the right to presume that these reasonable rules would be complied with, and it is not negligence for the railway company to fail to provide means for preventing accidents which will result from the violation of its rules. See the cases cited last above.

3. A Mr. Smith, a witness for the plaintiff, testified on direct examination that he had been an engineer of the Southern Pacific Company for about 22 years; that he could see an ordinary white light from such a sized lantern as that placed on the rear of the helper engine a mile under ordinary conditions, but that it would be very hard to distinguish this light on the night in question, because it might be on something else. On cross-examination the court refused to permit him to answer this question:

"You speak of not being as likely in looking back to tell whether this is a white light; it might be somewhere else; it might be some other thing. But if you were perfectly familiar with the road, and you saw that light upon the line of road, and you knew where the road ran, would it be a warning to you if you saw that light there?"

This was proper cross-examination upon a very material, yea, a crucial, point in the case, and the court should have permitted the question to be answered.

4. A witness who was qualified to answer the question, by knowledge of the rules and of the condition of the engine, was asked whether the helper engine was equipped according to the rules of the company, and answered that it was. The court struck out the answer because it called for the conclusion of the witness. In my opinion, the answer should have been received, and constituted proper expert testimony.

For the reasons which have been stated, but chiefly because there was no evidence that the railway company was guilty of any negligence which was either the proximate or concurring cause of the collision, the court below should have instructed the jury to return a verdict in its favor, and the judgment below should be reversed, and the case remanded for a new trial.