## HARSTAD v. STONE & BRANDT.

(Fourth Division.   Fairbanks.   September 2, 1910.)

No. 1192.

1. MASTER AND SERVANT (§ 118*)—MINES—NEGLIGENCE.

The master is bound to provide, as an ordinarily prudent man, a reasonably safe place for the servant to work, and what is a reasonably safe place depends in each instance upon surrounding circumstances.   It was the duty of the defendants in this case to keep the roof of the drifts in as safe condition as they could consistently with a reasonable and practical mode of carrying on their business.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 177, 202, 209;  Dec. Dig. § 118.*]

2. MASTER AND SERVANT (§ 235*)—MINES—CONTRIBUTORY NEGLIGENCE.

The conditions of danger that imposed the duty of careful inspection upon the owner and operator of mines in Alaska also imposes a corresponding duty upon the miner.   The owner has the right to suppose that the servant will be alert and observing and employ diligence to detect and avoid the dangers which a man of ordinary prudence would do for his protection, under like conditions.   He must, to protect himself from injury, use diligence commensurate with the dangers known to him to be incident to the character and place of his work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 710–722;  Dec. Dig. § 235.*]

3. MASTER AND SERVANT (§ 213*)—ASSUMPTION OF RISK.

Where the servant is engaged in making a dangerous place safe, the usual rule that the master must provide a safe place does not apply.   The servant assumes the ordinary risks and dangers of his employment.   When he engages in the work of making a place that is known to be dangerous safe, the hazard of the dangerous place, and the increased hazard of the place made dangerous by the work, are ordinary and known dangers of such a place, and, by his acceptance of the employment, the servant necessarily assumes them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 559–564;  Dec. Dig. § 213.*]

This is an action for damages for personal injuries alleged to have been sustained by the plaintiff by reason of a fall

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

of gravel and sand from the roof of a drift in the mine of the defendants on Vault creek, in the Fairbanks recording district. The action was tried by the court; the attorneys for the respective parties expressly waiving a jury.

Louis K. Pratt, of Fairbanks, for plaintiff.
Heilig & Roden, for defendants.

OVERFIELD, District Judge. The evidence in this action is conflicting on pivotal points, around which the court must base its opinion, and by reason of the fact that the court consented to hear the action without the aid of a jury, it is but natural that the evidence and law should be considered in the same order as would have been done with a jury in attendance.

The first point in which the plaintiff and many of the witnesses differ in a marked degree in their testimony is as to the height of the roof of the drift from which the mass of earth and gravel fell, causing plaintiff's alleged injuries. He is positive that it was not less than 14 or 15 feet. In this contention he is supported by the testimony of his brother, who worked as a pointman in the same mine, working nights, as well as that of the testimony of one Anderson, his partner, who was shoveling into the same car with the plaintiff on the morning of the accident. Some of these witnesses contend that the roof was too high at that point for them even to stand on the cars and pick down the loose dirt and gravel from it.

Opposed to this testimony, and positive in its terms, is that of Stone and Brandt, the defendants, Weitzel, their foreman, and one Krim, a colaborer with the plaintiff, who was working on the same face of the drift with the plaintiff and Anderson on the morning of the accident. They swear positively that the roof in question was not, at the extreme, over eight feet, if not less, and, if so, within reasonable reach for the miners to pick it down.

I am convinced that the testimony, by a fair preponderance, shows the drift roof alongside of the tunnel, at the place where the injury took place, was not 12 to 15 feet in height, as con-

4 A.R.—13

tended by the plaintiff and his counsel, but was between 7 and 8 feet.

The next question to arise is: What was the duty of the defendants, under the circumstances, with respect to providing a safe place in which their men should work? The general rule of law, I take it, is applicable, at least in a modified form, that a master is bound to provide, as an ordinarily prudent man, a reasonably safe place, and what is a reasonably safe place depends in each instance upon surrounding conditions. It was the duty of the defendants in this case to keep the roof of the drifts in as safe condition as they could consistently with a reasonable and practical mode of carrying on their mining.

Drift mining by means of steam points to thaw the gold-bearing sand and gravel is at best a hazardous and dangerous business. It is incumbent upon the operator to provide for a reasonable inspection of such places as will afford as full security for his men as can be reasonably made practical, in view of the nature of the work. What each mineowner must do in detail, in providing that the roof shall be picked down or timbered for his drift mining, to protect his men from the thawed sand and gravel falling on them, must depend upon the varying conditions and circumstances, depth of gravel and its character, the time of the season the work is being carried on, the amount of cool air, and the number of air shafts connected with the underground workings, etc.

There is no doubt but that, under such conditions and mode of mining as was being carried on by the defendants at the time of the accident to the plaintiff, the partners were in duty bound to have some one whose duty· it would be to direct, and command, if necessary, that precautions be taken for the safety of the laborers by way of inspection, watchfulness, and care.

There is no allegation nor evidence that Weitzel, the foreman, was incompetent, but that he was in charge of the underground mining, with full power to carry on the work there. By reason of his employment, his duties would have made it compulsory upon him to have erected timbers above the spot

of the accident, had they been necessary, or to have dug down the loose sand and gravel, or have delegated such powers and duties to others, and a failure to have done so would have been actionable negligence, provided the plaintiff was free from fault.

There is evidence, however, that Weitzel, the foreman, usually inspected the roof of the drifts and the works underground, and, when he deemed it necessary for the purpose of his work, ordered square sets put in at the junction of the lateral tracks with those of the tunnel tracks, sometimes setting up two timbers, across the top of which was placed a cap, and lagging then placed thereon, the ends of which would rest on the cap and on top of the lagging of the tunnel. The distance of the square sets from the tunnel varying from three to six feet. At other times, instead of having one end of the lagging resting on top of the lagging of the tunnel, an extra set of timbers would be placed alongside and leaning against the tunnel timbers, and the ends of the lagging placed on this cap timber. The evidence showed that such timbering was usually put up by the pointmen during the night, before they began putting in a thaw in the face of the drift. The reason for the pointmen doing this work was because they had the time to bring the timbers from the worked out part of the tunnel and drifts, usually taking the timbers from that part of the tunnel which was no longer in use, at least whenever the sloughing of the roof and the slabbing down of the frozen parts of the roof had not destroyed the timbers, or so deeply and heavily covered them up that they might be removed readily and secured for the use intended. The pointmen would then erect such timbers, and afterwards, as was another of their duties in this mine, lay the lateral track as close to the face of the new thaw as they could conveniently do, usually within two or three feet. By following this custom, the timbers erected with the lagging thereon would catch the loose thawed rock and gravel, and prevent the necessity of hoisting it to the surface. Considerable thawing of the roof would necessarily follow from the escaping steam from the thaw they were then engaged in. The evidence of both Weit-

zel and the plaintiff's brother, who assisted with the points in thawing the mine, was that at times the pointmen could and did use their own judgment as to when they should put up square sets along the face of the drifts nearest the tunnel and over the lateral tracks, but that as a rule the foreman told them when to put up such timbers.

A fair preponderance of the evidence does not convince the court, from all the evidence, that it was either desirable or practicable, for the protection of his miners, for the defendant to place timbers, covered with lagging, in the drifts where the height of the roof did not exceed that in the place in question. This conclusion is reached from the testimony of the witnesses who either worked in the mine or were acquainted with the mode of mining employed in this mine, and who knew the conditions existing in this mine from personal observation, and who testified that the erection of such timbers, under such circumstances, would prove of little value for the protection of the men, in the case of a quantity of dirt falling down, as alleged by the plaintiff to have fallen, for the reason that the timbers contended for by the plaintiff were not erected in such a manner as to be braced, and a quantity of dirt falling upon them would either break the lagging or topple the entire structure over, and the additional reason that, when timbers were thus erected, the miners would depend upon them, rather than looking to the actual condition of the roof above them, and digging the same down, as is the usual and practical custom in such mining, but also for the additional reason that such square sets are never used in such underground drift mining, for the protection of the men, but, if erected at all, are for the purpose of protecting the lateral rails and the turn sheet, which is situate at the junction of the track in the tunnel with that of the rails in the drift.

The evidence does show that such timbers and lagging are sometimes employed for that purpose, and to catch up the waste and gravel from the roof of the drift, where there is lack of necessary space to throw it back upon the ground already drifted, it being a cheaper and quicker way to dispose of such waste than to have the same constantly falling down

upon the drift tracks and compelling the workmen to shovel the same into cars and hoist it to the surface; all witnesses agreeing that little, if any, protection is ever thus given or thus provided for the workmen.

And I am not prepared to say that it would not still be much safer for the miners to have the loose ground and gravel of the roof picked down by some method, rather than have the character of timbers and lagging to be found and used in this country, even when the roof be much more than the height from the floor in the drift than was found in this case.

A slight knowledge of the mode of mining underground in this frozen country warns every miner of little experience that, each and every time a thaw is made in the face of the drift, some steam will inevitably escape, and the roof of the previous thaw will respond to the action of this escaping steam and become thawed, depending upon local conditions as to the extent the material of the roof will become loosened, and when it may be expected to fall.

No more experience is required to demand that the miners who begin taking out those thaws should first clear the roof above their heads of all loose stone, gravel, and sand, before beginning to take down the pay dirt. That such a duty was imposed upon the plaintiff and his coemployés at the defendant's mine is shown by a fair preponderance of evidence, and that it was and is a reasonable duty devolving upon the miners so engaged in such work, as a matter of law, I have no doubt.

The conditions of danger that imposed the duty of careful inspection upon the owner and operator of mines in Alaska also imposes a corresponding duty of care upon the miner. The owner has the right to suppose that the servant will be alert and observing, and employ diligence to detect and avoid the dangers which a man of ordinary prudence would do for his protection, under like conditions. He must, to protect himself from injury, use diligence commensurate with the dangers known by him to be incident to the character and place of his work.

What, under the circumstances, should have been expected of this plaintiff? He was far from an inexperienced miner,

considering the character of the work he was employed to do. He had been employed daily for six months previous in the identical work he was doing when injured, where the conditions had been practically the same for the entire time. While there is no positive evidence that he was informed of the dangers in connection with his work, it is not unreasonable to conclude that six months' labor digging out pay dirt and gravel in the face of an underground drift had given him many a forceful and practical demonstration of the dangers of permitting the loose ground, stone, and gravel to remain in the roof of his work, when it could be made secure by picking it down to the frozen part. There is testimony to show that the plaintiff did not know of the dangerous condition of the roof at the place where he was working, but the testimony of several witnesses conveys the fact that it could easily have been detected, that it was easily discernible and obvious.

It may here be remarked that the defendant's mine underground was lighted by means of electricity, 16 c. p. lights being placed on shovels, which were distributed and set upright in the waste piles in the rear of the lateral tracks, thus throwing light upon the faces thawed in which the men were working; that these lights were placed about six feet apart, and naturally made the mine much lighter than if the ordinary tallow or paraffine candles were employed, as is the usual custom in this district.

The witness Anderson says, in his deposition: That he plainly discerned the previous evening, when ordered by the foreman, Weitzel, to go with the plaintiff to the spot to work, a crack in the roof between the previous thaw and the new one. That it extended in the roof from the side of the tunnel out into the drift some 10 or 15 feet, and that at the time he refused to shovel into the car on the side nearest the tunnel, and protested to the foreman, in the presence of this plaintiff, and for that reason the plaintiff took that particular place and shoveled some three car loads of dirt into the car, on the evening previous to the accident. The witness Vandersluice, though on top the day of the accident, was on the previous day working in the end of the mine in which the

accident happened, as he said, in the same place, and testified, when asked the question as to the condition of the tunnel and faces, that:

"They were in pretty bad shape. There was a lot of thawed dirt in the roof, you know, but I always picked it down."

The witness Krim testified that on the morning of the accident, a few minutes before the occurrence, he came out the same drift with a loaded car and stopped where the plaintiff and Anderson were working, and entered into conversation with them concerning the condition of the roof under which they were working, and said to them, "It should be picked down." It is true that the witness is not positive that the plaintiff either entered into the conversation, or even heard it, but it is reasonable to suppose that on one of the two occasions Anderson took the opportunity to talk about this roof in plaintiff's presence. The plaintiff would have heard some of the conversation and interested himself at least to some extent.

Anderson's testimony plainly indicates that the ground in question was whiter than the thawed ground, and that a crack in the roof between it and the new thaw was plainly visible. The fact that the ground thawed in the roof of the previous thaw was white is because of the fact that the water had drained from it readily; there being no ground underneath it. That indication alone, in the color of the ground and roof, was sufficient to put the miner of ordinary experience and ability on notice that it was thawed and should be picked down. Whether the plaintiff heard the warning given him by his co-laborers or actually saw the danger is problematical to a certain degree; but if the conditions existed with reference to that roof that morning and the previous evening, as he claims they did, he was in duty bound, as a reasonable man, under the circumstances, to have known that more than ordinary danger was lurking over his head, and he had the option, as a reasonably prudent man should do for his own safety, to either pick the loose dirt and gravel down, as Anderson, Vandersluice, and Krim said they did, or call to the attention of the foreman the condition of the roof. When he failed to

do either, he assumed the risk incident to such places and conditions.

It is not essential, said Judge Ross, in a dissenting opinion, in the case of Puget Sound Electric Railway Co. v. Van Pelt, 168 Fed. 206, 93 C. C. A. 492, that an employé or servant shall have had absolute knowledge of such risk if they were such that an ordinary prudent man, in his situation, by the use of reasonable, ordinary prudence, would have known them. The majority opinion in the same case held the obligation on the part of the servant to be still greater. But, says Mr. Justice Moody, in the case of Butler v. Frazee, 211 U. S. 459, 29 Sup. Ct. 136, 53 L. Ed. 281:

"Where the elements and combination out of which the danger arises are visible, it cannot always be said that the danger itself is so apparent that the employé must be held, as a matter of law, to understand, appreciate, and assume the risk of it. * * * The visible conditions may have been of recent origin, and the danger arising from them may have been obscured. In such cases, and perhaps others that could be stated, the question of the assumption of the risk is plainly for the jury. But where the conditions are constant and of long standing, and the danger is one that is suggested by common knowledge which all possess, and both the conditions and the dangers are obvious to the common understanding, and the employé is of full age, intelligence, and adequate experience, and all these elements of the problem appear without contradiction from the plaintiff's own evidence, the question becomes one of law for the decision of the court."

The rule of reasonably safe place has been held not to apply in certain cases, the most notable of which was the case of Finalyson v. Utica Mining & Milling Co., 67 Fed. 507, 14 C. C. A. 492; the opinion being rendered by Circuit Judge Sanborn. The facts in that case disclose that a stope had been opened in defendant's mine to a height of some 20 to 65 feet from the floor level; that timbering had been carried along from the floor to the roof, to a distance of within 8 feet of the face of the stope; that the ore shot down was allowed to remain and pile up to within an easy distance for the men to stand upon the same and work in the roof and face of the tunnel. Austin, a miner, had been working in this face during the forenoon and had put in some shots. Upon his return in the afternoon, after lunch, he discovered that his

shots had opened up on the foot wall of the vein, just where the roof had been, a mass of gouge, 3 feet long, 2 feet wide, and 18 inches thick. This mass had not been visible until after the morning shots had been fired. Austin took his pick and worked at it for nearly an hour. He did not succeed in getting it down, and was about to get his drill and hammer when the foreman, Talbert, appeared. Austin told him that it was a dangerous looking chunk. Talbert replied, "You can get that down." Austin said he could not. Talbert then took a pick and tried to pick it down himself, but he could not. He then remarked, "There is lots of time; if we shoot that we lose the smelting ore that is alongside of it." Thereupon both men went to work picking and sacking ore. They worked so close to this mass of gouge that if it fell it must inevitably fall upon their bodies, unless they fortunately jumped from under it. About 20 minutes after Austin and Talbert had tried to dig this gouge down, Finalyson came along and asked Talbert where he should cut the hitch or notch for the next sill, so as to have it on a level with those already in place. Finalyson had been employed in any work required to be done in the mine, but generally at timbering, for a period of about two years. Talbert pointed to a place on the foot wall a little lower than and a little to one side of this gouge, a place that was neither in nor under it. Finalyson then cleared away a place and sat down with his back and shoulder against this chunk and commenced to drill in the foot wall a place for the notch. After he had drilled away on this wall for half an hour, the mass of gouge fell down and injured him. A directed verdict in favor of the defendant company brought the case before the Circuit Court of Appeals.

"It is the general rule that it is the duty of the master to exercise ordinary care to provide a reasonably safe place in which the servant may perform his services. Railway Co. v. Jarvi, 53 Fed. 65 [3 C. C. A. 433]. But this rule cannot be justly applied to cases in which the very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses. The duty of the master does not extend to keeping such a place safe at every moment of time as the work progresses. The servant assumes the ordinary risks and dangers of his employment that are known to

him, and those that might be known to him by the exercise of ordinary care and foresight. When he engages in the work of making a place that is known to be dangerous safe, or in a work that in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses, the hazard of the dangerous place and the increased hazard of the place made dangerous by the work are the ordinary and known dangers of such a place, and by his acceptance of the employment the servant necessarily assumes them."

The case of Railway Co. v. Jarvi, 53 Fed. 65, 3 C. C. A. 433, above quoted by Judge Sanborn, was referred to and discussed; that case standing for the proposition that the "safe place" rule did apply under the facts therein. Said Judge Sanborn, with reference to the Jarvi Case:

"In that case a miner, who was working about 100 yards from the place in which he was injured, went out through a passageway to get a car, and was injured by a rock which fell from the roof of the slope as he was passing under it. It was necessary for him to pass under this roof to get his cars and to go to and from his work. The railway company knew that this roof was composed of treacherous rock, and that it was a roof that might possibly fall and that needed watching. The only way such a roof could be properly tested was by sounding it with the hand or with a pick or cane, and there was no evidence that this roof had been so tested for weeks. Upon this state of facts this court held that there was some evidence of negligence on the part of the company, and applied to the case the rule of 'safe place.' But the roof which fell in that case had long been completed by the railway company, and was furnished to Jarvi as a safe cover for a way through which his duties required him to pass. He had no work to perform in making it safe, or in changing the character for safety in which the company furnished and maintained it. On the other hand, in the case at bar Austin and Finalyson were engaged in removing ore from the breast of the stope, and in making the place from which it was removed safe for subsequent work. The very timbering upon which Finalyson was engaged was the work of making a place safe that was necessarily made dangerous by the progress of the work," and "which it had employed Finalyson himself and his fellow servants to make safe. In other words, the complaint is that the master was negligent because it did not render unnecessary the work it employed the servant to do, before he commenced to do it. The distinction between this and the Jarvi Case is marked and clear, and, in our opinion, it brings it squarely within the other class of cases to which we have already referred."

Counsel for the plaintiff in this case contends that the rule of the assumption of the risk by the servant, as laid down in

the Finalyson Case, does not apply here, for the reason, as he suggested, by reference to two decisions in tunnel cases, in coal and hard rock mining, that the roof of the previous thaw should be compared to the roof in a timbered tunnel; that, after a thaw had been taken out, the defendants were under as much obligation to make that roof safe for the miners to work under as is the obligation of operators to timber and make safe the completed parts of a tunnel in process of construction. To this contention I cannot agree, for the reason that the very nature of the mining, the scarcity and character of timbers used, and the more reasonable rule of picking down the roof, and the still more practical and safe rule of having the miners held responsible for the roof, of the height here in question, over their heads in a worked out drift. This leads me to the conclusion that the rule in the Finalyson Case should here be applied. Under ordinary circumstances, such a duty is not placed upon the operator of drift mining in Alaska, in either providing the timber or picking down the roof, as is required by the decisions of masters to their servants in the running of tunnels or timbering in hard rock mining.

The application of the safe place rule, but in a modified form, in drift mining in Alaska, is made necessary by reason of the conditions under which such mining is made possible, at a reasonable profit; and, secondly, because the very act in which the miners are engaged when taking out the thaw is constantly changing the character of the conditions surrounding him, not only immediately above his head, in the roof of the thaw on which he is working, but in the roof of the next preceding thaw, in the same drift.

The pointmen are required to stand underneath the roof of the former thaw of necessity, when laying their track and driving their points into the face of the new thaw; the miners following to take out the thaw as soon as it is sufficiently cooled occupy the same position with respect to the roof of the drift, when they begin to remove the sloughed ground and waste preparatory to mining the pay dirt. As a matter of right and good common sense, the law does not demand that

the foreman, either in person or by another set of laborers, should expressly go along and pick down the roof along the face before the miners begin taking out the thaw. It is but natural that these miners should do that work themselves, not only as a reasonable and practical way to remove the loose waste, but in order to protect themselves at any and all times. It is necessary for another reason to apply, in a modified form, the rule of safe place to conditions such as exist in this action; and that is that, by reason of the change in the temperature of the mine, sloughing from the roof is ever present when the men are at work underground. Their mere presence in the mine, with the necessary lights to guide them in their labors, will produce sufficient heat to cause the falling of sand and gravel from the roof.

It is unnecessary to say that, as the ventilation of the mine becomes impaired, an additional heat is generated underground by reason of the presence of the steam pipe lines, rubber hose, numerous and necessary connections attaching the points, and the almost inevitable result that more or less steam will escape from some of the joints and connections, and especially from the points in the face of the thaw. It is by reason of this rather unique and unusual condition existing in underground drift mining in Alaska that it seems both just and proper, to both operator and laborer, that the law of safe place should be applied only in a modified form. It would be almost an impossibility, and certainly the height of folly, to demand or expect the foreman to be responsible for the condition of the roof in such mining, when it is within the easy reach of the laborer with his pick and shovel; and he is constantly standing at the place and knows when it is and will be necessary for him to repeatedly remove the more or less constant accumulation of thawed ground in the roof above his head.

The plaintiffs do not deny the applicability of this law and reasoning to the ordinary drift and its roof, except as to that part of the drift next to and paralleling the tunnel. The plaintiff contends that here the safe place rule should apply, by reason of the fact that the necessary process employed in run-

ning the tunnel by constantly applying live steam to the points, and in making the number of thaws necessary to run the tunnel 160 feet, will, in itself, cause the roof of the tunnel, as well as its sides, to become thawed in varying depths and thickness. He likewise contends that the escaping steam from the drift would naturally rise to the roof and pass out along the tunnel to the shaft, then to the surface; that the hole in the roof of the drift alongside of the tunnel, from which the dirt fell, inflicting the alleged injury to the plaintiff, was caused by this escaping steam passing at that particular place from the thaw into the tunnel, and that, by reason of this escaping steam thawing in the roof of the tunnel and along its sides, a much thicker mass of gravel and sand is thawed in the roof of each face along the side of the tunnel, and for that reason the roof is inevitably higher at that portion of the drift than at any other portion, and, as the plaintiff alleges and testifies in this action, the roof at the point he was working reached the height of 15 feet from the floor of the drift.

The evidence uncontradicted shows that the roof of an ordinary thaw in this mine was from 4½ to 5 feet, and that by reason of sloughing became at least from 2 to 12 inches higher by the time the next succeeding thaw was taken out. Ordinarily such a roof reaches the height of not more than 6 to 7 feet during the time the laborers are required to work under them. That the roof of the drifts ultimately sloughed much higher and sometimes slabbed down in immense quantities, filling the entire space of the worked out drifts, there is no contention. The witnesses invariably fixed the height of the roof of the tunnel as being from 1½ to 2 feet above the lagging of the timbers of the sets in the tunnel, making this roof ordinarily about 7½ to 8 feet to the highest point, which is in the center of the roof of the tunnel.

It will be observed that the side of the drift adjoining the tunnel will be higher than in the drifts some distance away from the tunnel, and this difference is usually evidenced by an arched shaped roof extending from the top of the tunnel into the roof of the drift, sometimes for a few inches, and at

other times for several feet. A moment's consideration and thought will convince that, had the roof at the point where plaintiff was alleged to have been injured risen to a height of from 12 to 15 feet, it would have been so unusual and out of the ordinary as to have caused any miner, of even a few days' experience, to have hesitated before going underneath to work; such a condition in the roof amounting to what is termed a "glory hole" in drift mining, and would have caused exceptional interest, fear, and comment, not only among the miners, but also between the operator and the foreman.

I am convinced, as was said above, that such conditions did not exist at the time in question.

Then, considering the usual and ordinary height of the roof to the drift adjacent to the tunnel, we find the condition little different than the height of the main roof of the drift. The ground thawed immediately adjoining the tunnel roof and sides to a depth of from one to two feet, and the roof at that point of the face of the drift about the same distance higher than the remaining portion of the roof along the face of the drift. That is, the roof along the edge of the tunnel, in the face, would be from 6½ to 7 feet in height, and it might vary a foot or two higher in places. The plaintiff alleges that this portion of the drift alongside of the tunnel should have been timbered or picked down on the morning of the accident to the plaintiff, at the place where he was shoveling into the car. A fair preponderance of the evidence convinces the court that the reasonable and practical way to have made plaintiff safe from the fall of the mass in question was to have picked it down; that a casual look by plaintiff would have been sufficient, considering his experience, knowledge, and opportunity, to have warned him of the necessity of removing the overhanging loose gravel and stone.

This plaintiff, as an ordinarily prudent man, employing the ordinary and reasonable amount of prudence to be expected, taking into consideration his age, education, knowledge, and experience as a miner in this particular mine, should have been watchful and alert to the conditions of the roof above his head, in the drift where he was required to labor. He failed in this

instance to be as careful and prudent as he should have been, or, if he actually knew the surrounding conditions of the roof, deliberately stepped under it, and thereby assumed the hazardous risks and dangers incident to such conditions.

Let findings of fact and conclusions of law be submitted, and judgment will be entered accordingly.