## HOLLAND v. DURHAM COAL AND COKE COMPANY.

1. The general rule of law declaring the duty of a master in regard to furnishing a servant a safe place to work is usually applied to a permanent place, or one which is quasi permanent. It does not apply to such places as are constantly shifting and being transformed as a direct result of the servant's labor, and where the work in its progress necessarily changes the character for safety of the place in which it is performed, as it progresses.

2. In a suit by a servant against a master, on account of a personal injury received by the former from alleged unsafe condition of a place of work which falls within the general rule requiring diligence on the part of the master in furnishing to the servant a safe place in which to work, it must ordinarily appear that the master knew or ought to have known of the danger by the use of due care on his part, and that the servant did not know and had not equal means of knowing such fact, and by the exercise of ordinary care could not have known thereof.

3. While some portions of the charge to which exceptions were taken may not have been entirely perfect in form of expression, yet, when considered in the light of the evidence and of the whole charge, they are not such as to require a reversal.

4. The evidence was sufficient to support the verdict, and there was no error in overruling the motion for a new trial.

Submitted June 20,—Decided December 19, 1908.

Action for damages. Before Judge Wright. Walker superior court. November 30, 1907.

Holland brought an action against the Durham Coal & Coke Company, seeking to recover damages for a personal injury received by him while working in the coal mine of the defendant. The practice was to dig out a gallery or entry, and from this rooms were excavated on the side. Sometimes all the coal was taken out of them, but generally pillars of coal were left in the rooms for the purpose of supporting the roof. After the excavation in certain rooms was completed and all the coal taken out except the pillars, so that they were ready to be abandoned, the coal in the pillars would then be taken out, or, as it was termed, the pillars would be "drawn." In regard to the duty of timbering, the plaintiff was asked, "Were you to do any of the timbering?" to which he answered, "Why, it would have been my duty, after I had taken the coal out, to have timbered. Where that block was standing it would have been my duty to timber that, as I taken it out." He was asked, "Whose duty was it to timber this room you went to work in?" He answered, "The company's duty, sir, after these

other men had quit." He did not put any posts in when he went there. Another witness introduced by the plaintiff testified that, "As we went along there, it was our duty to do our own timbering. This was the miner's duty. If we saw the top was bad, we put up timbers. . . It is the miner's duty to timber the room as he drives the room up; that is as he takes the coal out; when a man goes there to take coal out of a pillar, it is part of his duty to see that the room is propped where he works. When he commences to work, it is his duty to see that it is timbered up." Another witness said: "I suppose that the custom there and the duty of the miner before he commences to work on a pillar is for him to go in and see if the place is safe." Still another witness for the plaintiff said: "It was the duty of this timber gang to do the timbering in the entries; and when a mine room gets too bad, ordinarily the miner would notify the foreman of the gang, and it was then his duty to go and timber it up." Witnesses introduced by the plaintiff testified, that two of them started to take out the pillar, where the plaintiff was hurt, but quit because it became evidently dangerous; that the slate was rotten and broken and fine slate was falling; that the top was "drummy and drippy," that is the top leaked and dripped fine slate; that in beginning the work of removing the pillar as miners they put in some timbers, but the place was so apparently dangerous that they were afraid to continue work, and stopped. One of these witnesses stated that on the evening before the injury the plaintiff was talking with him about the coal there which was easily to be gotten, and the witness stated that if the top did not get better he and those working with him were going to quit. The next morning after this conversation the witness and those working with him quit because of the danger, and so notified the foreman. The plaintiff was then offered the work, and undertook it. He admitted that the ordinary price of digging coal was fifty-two cents a ton and that he and his assistant were to get fifty-seven cents a ton for digging out these pillars; though he said that this extra pay was for the extra work, and not on account of the extra danger that there was in doing it, and that he took this work to accommodate the foreman, "to save his entry." Plaintiff said: "You always have to do the timbering where you take the coal out anyway; nothing extra is paid for that. Where a miner takes a place and starts it off,

it is his duty to look after himself. Where he is drawing pillars, it is the boss's duty to see that it is safe for him when he puts him to work, and his business to see that it remains safe. He sounded the top, but could not tell anything about it. He put in no posts. There was one there put in by others who had begun work at that point. He was informed, before beginning work there, that other employees, who had begun to draw the pillars, would not work on it, and the foreman had "sent them to the office." He also said that the foreman informed him that one of the pillars was a little dangerous, but not the one where the plaintiff was afterwards hurt, "and all it needs is work." He denied that there was a leaking or dripping when he went to work. Directly after the plaintiff began digging on the pillar a rock fell on him and injured him. He stuck his pick in a seam of mud between two seams of coal. This was calculated to jar the coal above. There was some evidence that he was on the track running beside the pillar when injured. He was thirty-eight years of age, and had been working in coal mines for twenty-nine years, and was familiar with matters of this kind. There was other evidence for the plaintiff, which it is not necessary to set out in detail.

The evidence for the defendant tended to show, that, in work of the character of that which the plaintiff was doing, it was his duty to look after the top of the room for himself and to do any timbering necessary to keep himself safe, and not to allow any rock to fall on him; that if the top is in condition to do so, the miner should keep it timbered and safe as he digs, and if he thinks or sees it is too dangerous, he should call the attention of the bank boss, who notifies him what to do and tells him what he thinks about it; that the work was clearly dangerous; that the company had done the timbering required of it; that the foreman made a chalk mark as a place to start from (though one witness said the foreman told them they could use their own judgment about going beyond the mark); and that the place where the plaintiff was injured was some fifteen feet beyond the mark so made. A witness for the defendant thus stated the duty in regard to timbering in connection with the drawing of pillars: "In regard to the custom or practice of the defendant as to who does the timbering when a miner is set to pulling pillars in a room, the

miner must do his own timbering, because every lump of coal he digs out or every lick he strikes changes the condition of that roof, and he must be there to do his own timbering. Nobody can do it for him, because he changes the condition of the roof as he strikes. Just like this wall would be changed or disconnected, perhaps, if you were to take a brick out. The miner himself is the judge as to whether he shall put a prop up. The company furnishes the timber to the outside of the mine, put up in piles, and the miner marks it and it is brought in to him."

The jury found for the defendant. The plaintiff moved for a new trial, and upon the overruling of the motion he excepted.

*T. J. Smith, Daniels & Williams,* and *R. M. W. Glenn,* for plaintiff. *Brown & Spurlock, Payne & Payne,* and *J. P. Shattuck,* for defendant.

LUMPKIN, J. (After stating the foregoing facts.)

1. The main question involved in this case arises on the following charge of the court: After stating the duty of the master to exercise ordinary care and diligence to provide a reasonably safe place for the servant in which to work, he added, "And, in that connection, I charge you this: The rule requiring the master to use reasonable care in furnishing the servant a reasonably safe place in which to work is usually applied to a permanent place, and not such places as are constantly shifting and being transformed as the direct result of the servant's work; nor does it apply to places which the servant is employed by the master to make safe. If you believe from the proof that the defendant coal company owned the coal mine, and it had in that mine a room from which all the coal had been taken except the sides or walls between this room and other rooms, and the company desired and intended by the work committed to the plaintiff to take the coal from the room with a view of ceasing operations there and abandoning this place, and this was known to the plaintiff, and the roof was bad and dangerous to work in, and the plaintiff and one Manning were given the contract to take out the remaining coal and the pillars that supported the roof, and it further appears to you from the proof that the work which the plaintiff and his associate, Manning, contracted to do had the direct effect as it progressed to change the condition and character of the place where the work was to be done, as to safety, then I charge you

that the general rule, requiring the master to furnish a safe place
to work, has no application in this case."

In a number of States statutes have been passed in reference to
the duty of mine owners or operators as to furnishing timbers
to the miner and as to the use of them by the latter, and other mat-
ters touching the rights and duties of the two. In this State there
is no statute on the subject. The general principle of law in-
volved in this charge is well supported by authority. In the lead-
ing case of Finalyson v. Utica Mining & Milling Co., 67 Fed. 507
(14 C. C. A. 492), the rule is thus stated by Sanborn, J. (p.
510): "It is the general rule that it is the duty of the master
to exercise ordinary care to provide a reasonably safe place in
which the servant may perform his service. Railway Co. v. Jarvi,
53 Fed. 65 (3 C. C. A. 433, 10 U. S. App. 439). But this rule can
not be justly applied to cases in which the very work the serv-
ants are employed to do consists in making a dangerous place
safe, or in constantly changing the character of the place for
safety as the work progresses. The duty of the master does not
extend to keeping such a place safe at every moment of time as
the work progresses. The servant assumes the ordinary risks and
dangers of his employment that are known to him, and those
that might be known to him by the exercise of ordinary care and
foresight. When he engages in the work of making a place that
is known to be dangerous, safe, or in a work that in its progress nec-
essarily changes the character for safety of the place in which it is
performed as the work progresses, the hazard of the dangerous place
and the increased hazard of the place made dangerous by the work
are the ordinary and known dangers of such a place, and by his ac-
ceptance of the employment the servant necessarily assumes them."
The trial judge in that case had directed a verdict for the defend-
ant. The majority of the Circuit Court of Appeals were of the
opinion that, under the evidence, this direction was right. Cald-
well, J., filed a vigorous and interesting dissenting opinion, hold-
ing that the question of negligence should have been submitted
to the jury. Among other things he said: "It is said in the
majority opinion that 'the complaint in this case is that the
master was negligent because it did not, before Finalyson com-
menced to timber, safely timber and make safe a place necessarily
made dangerous by the progress of the work which it had employed

Finalyson himself and his fellow-servants to make safe.' This is a cogent statement of a purely imaginative case.. It certainly is not a statement of what the plaintiff claims or what the proof establishes:"

In Heald *v.* Wallace, 109 Tenn. 346 (71 S. W. 80), it is said: "The general rule of law—the common law—making it the duty of the master to furnish the servant with a safe place to work is usually applied to a permanent place, and does not apply to such places as are constantly shifting and are being transformed as the direct result of the servant's labor, as a room or place to work in a mine." The charge now under consideration appears to have been derived, at least in part, from the decision last cited, and to have followed it closely. See also White on Personal Injuries in Mines, § 195; 2 Bailey on Pers. Inj. Mas. & Serv. §§ 3023, 3028; 2 Labatt on Master & Servant, § 588; Rolla *v.* McAlester Coal Mining Co., 6 I. T. 404 (98 S. W. 141); Watson *v.* Kansas & Texas Coal Co., 52 Mo. App. 366 (4); Oleson *v.* Maple Grove Coal & Mining Co., 115 Iowa, 74 (87 N. W. 736); Petaja *v.* Aurora Iron Mining Co., 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. R. 505); Armour *v.* Hahn, 111 U. S. 313 (4 Sup. Ct. 433, 28 L. ed. 440); Consolidated Coal and Mining Co. *v.* Clay's admr., 51 Ohio St. 542 (3a), (38 N. E. 610, 25 L. R. A. 848); City of Minneapolis *v.* Lundin, 58 Fed. 525 (7 C. C. A. 344). The exact point has not been decided in this State, but it has been held that where a master employs a servant to repair defective machinery, the rule as to furnishing reasonably safe machinery does not apply to the machine to be repaired. *Green* v. *Babcock Lumber Co.,* 130 *Ga.* 469.

It would seem that if an entry or room in a mine has been made, so that employees must pass to and fro in it, or be engaged in working in a place thus permanent or quasi permanent in character, the general rule as to the duty of the master ought to apply. Highland Boy Gold Mining Co. *v.* Pouch, 124 Fed. 148 (61 C. C. A. 40); Union Pacific Ry. Co. *v.* Jarvi, 53 Fed. 65 (3 C. C. A. 433). But the case now under consideration is not of that character, and does not require a decision as to when an entry or room in a mine may become a place of work, which the master must employ due care to keep safe. Here the miner was engaged in tearing down, or "drawing" the pillars of coal which had been left to support

the roof of rooms, both to get the coal contained in the pillars and with a view to the abandonment of the rooms, and allowing the roof to settle, so as to relieve the entry. Every stroke of his pick took away some of the support of the roof, and at once created and changed the extent of the danger. The plaintiff was an expert miner of long experience, and knew these facts. As to this there was no conflict. So fas as the duty of the master to furnish a safe place to work was involved, the evidence authorized the charge, and there was no error in giving it, for any reason assigned. The charge here dealt with is on the subject of the duty of the master to furnish a reasonably safe place in which to work. We do not fail to recognize, when the facts of a case make it applicable, the law touching the duty of the master to warn the servant of a latent danger of which the master knows or ought to know, and which the servant does not know and has not equal means of knowing, and could not know by the use of ordinary care; or the question of duty of inspection.

It is doubtful whether the evidence authorized a charge on the subject of whether the master, or one occupying the position of an alter ego of the master, directed the servant to work in a particular place where the injury occurred and assured him or represented to him that it was a safe place, and that the servant relied on such statement, so as to raise the question of the effect of such assurance or representation upon the diligence of the servant, and the question of whether the servant might rely on superior knowledge on the part of the master or his alter ego in regard to such matters. There was also no proper request to charge more fully than was done on the subject of any special circumstances affecting the general rules laid down in regard to the duty of a master in furnishing a safe place for a servant in which to work.

2. Where a suit is brought by a servant to recover damages from a master on the ground that the latter has been negligent in not furnishing to the former a safe place in which to work, in order to recover it must, as a general rule, appear that the master knew or ought to have known of the defect or danger, and that the servant did not know and had not equal means of knowing such fact, and by the exercise of ordinary care could not have known thereof. See Civil Code of 1895, § 2612, which is on the allied doctrine of the duty of the master to use diligence in furnishing tools and machin-

ery to the servant; *McDonnell* v. *Central Ry. Co.*, 118 *Ga.* 88-90 (44 S. E. 840). In *McDonnell's* case (p. 89) it is said that "it is sometimes expressed that it is incumbent on the servant to show not only negligence on the part of the master but due care on his own part." Reference is made to *Brush Electric Light & Power Co.* v. *Wells*, 103 *Ga.* 512 (30 S. E. 533), and *McDaniel* v. *Acme Brewing Co.*, 113 *Ga.* 80 (38 S. E. 404). In the former case the question arose on a charge that the servant must show that the master was at fault, or that he himself was not at fault. That case not being a suit by an employee of a railroad company, for which provision is made by special statute (Civil Code, §§ 2323, 2297), and as to which a distinct set of decisions has grown up, such a charge in the alternative was held to be erroneous. In the *McDaniel* case the expression referred to was used, taken from Wood's Law of Master and Servant. Whether evidence of freedom from fault on the part of an injured employee is necessary to the making out of his case, or whether contributory negligence is matter of defense, has caused some conflict in the decisions of courts. Some of the courts seem to have entirely ignored any distinction between the doctrine of assumption of risks and that of contributory negligence (as that term is generally employed). The two are closely related and often overlap, so that they have been sometimes treated as identical; but they are not strictly so. Thus a servant injured by a defective tool may by his evidence make out a case which negatives the idea that he assumed the danger as one of the ordinary risks of his occupation, and yet he may have used the tool in such a negligent manner as to prevent a recovery. This simple illustration will suffice, we think, to indicate that the two doctrines, though somewhat similar, are not exactly the same. See 2 Labatt, Master & Servant, §§ 841 et seq., 305 et seq. Whatever may have been the differences of other courts, it is not easy to reconcile the statement in the *McDaniel* case that the servant must show himself free from fault, if intended to mean that the servant must show himself wholly free from fault in all respects, as a condition precedent to recovering at all, with the earlier case of *Hill* v. *Callahan*, 82 *Ga.* 109 (8 S. E. 730), where it was declared that "The code section 2972 (now § 3830) has somewhat modified the rule of the common law, and declares that, in a suit by an employee against his employer for injuries received while in the service, the defendant is

not relieved, although the plaintiff in some way contributed to the injury sustained." The section cited refers in part to the doctrine of comparative negligence, or, as it is commonly termed in Georgia, contributory negligence, and provides that "If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. But in other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained." Possibly the two decisions may be reconciled on the idea that, in order to make out his case and relieve himself from the doctrine of assumption of risks, the servant must show certain things. Wood in his Law of Master and Servant, §382, has stated that the servant is met by two presumptions, both of which he must overcome: first, that the master has discharged his duty to him by providing suitable instrumentalities for the business, and in keeping them in condition, and that this imposes upon him the duty of showing that the master had notice of the defect, or, in the exercise of that ordinary care which he is bound to observe, he would have known it; and that when this is established, he is met by another presumption, the force of which must be overcome by him, and that is that he assumed all the usual and ordinary hazards of the business. Language used in an opinion of a Justice of the Supreme Court, in discussing the facts of a case, is not always appropriate for use by a trial judge in charging a jury. *Atlanta & West Point R. Co. v. Hudson,* 123 *Ga.* 108 (51 S. E. 29). It would be best, ordinarily, in a case by a servant against a master for injuries resulting from defective tools or machinery or on account of the furnishing of an unsafe place to work, in stating what must appear, not to use the expression that the servant must show himself free from fault, but to follow the line indicated in section 2612 of the Civil Code, dealing, however, with special facts where applicable, such as childhood, inexperience, or the like, as required by the circumstances of any particular case. While the presiding judge in this case, in charging on the subject of knowledge by the master of the danger, or whether he could have known of it by the use of ordinary care, stated that the burden was on the plaintiff to show negligence on the part of the master and at the same time to show due care on his part, yet he immediately followed this expression with the statement that if the servant showed that the place furnished for him

to work in was a dangerous one, and that the master knew or ought to have known of the dangerous condition and the danger to which he was exposed, he would have carried the burden required by law so far as proving the master's negligence was concerned; and if he showed that he did not know of the danger, and did not have equal means with the master in discovering it, and could not have discovered it by the exercise of ordinary care, he established a prima facie right to recover, if he had carried the burden of showing negligence on the part of the master.　　The context shows clearly that the duty imposed upon the servant by the charge, of showing due care on his part, referred to the exercise of ordinary care to discover the danger referred to in the latter part of the same charge. In connection with its context, the charge was not calculated to injure the plaintiff, and did not require a new trial.

3, 4.　The motion for a new trial contained a number of other grounds, but none of them are such as to require a new trial.　In one or two instances the presiding judge may not have employed absolutely accurate and apt language.　Thus, in one portion of his charge, in referring to the duty of the servant to exercise diligence, he employed the expression "active diligence;" but the context showed that he meant no more by this than ordinary care.　An examination of the entire record, and reading the portions of the charge to which exceptions were taken in connection with the whole charge and the evidence, satisfies us that there was no such error as to require a reversal.

*Judgment affirmed.　All the Justices concur.*