## 5746.   CHEROKEE BRICK COMPANY *v.* HAMPTON.

1. As a general rule, the contractual relation of master and servant includes an implied agreement on the part of the servant to assume the risks ordinarily incident to the service for which he is employed, but this term of the contract (which is implied from the nature of the relation created by the contract of service) may be abrogated by a distinct order on the part of the master to use a dangerous appliance in the manner directed by the master, accompanied by an implied assurance

that the instrumentality which the servant is directed to use is safe. Under such circumstances, the order of the master may amount to a waiver of his right to insist upon the servant's implied obligation to assume risks, which will thereafter estop the master from asserting that the servant assumed the hazard attending the act which the master himself directed.

2. A court can never judicially declare that a servant has failed to exercise ordinary care in performing an act in obedience to the orders of his master unless, after a consideration of the circumstances in the case, including the orders given the servant, the demands of his duty, the apparent risk to be met and the purposes his act was intended to subserve, it is obvious that the risk was so great that it would not have been hazarded by any man of common prudence.

3. Knowledge of a danger is not necessarily conclusive evidence of negligence in failing to avoid it, and there are circumstances under which it does not follow from the fact that the servant voluntarily took some risk that he was not using due care. 3 Labatt's Master & Servant (2d ed.), § 1236. "Where several conditions combine to produce an injury, the servant can not be held to be guilty of contributory negligence, as a matter of law, where he knew of only a part of these conditions." Hence his action will not be barred on the ground that he was guilty of contributory negligence in doing an act which was the immediate cause of his injury unless it is made to appear that he knew or ought to have known all the material conditions which would render it imprudent to do the act. 3 Labatt's Master & Servant (2d ed.), § 1233. The servant may maintain an action unless, in addition to knowing the risk to be encountered, he also knows that it will probably be attended with an injury which could be avoided by the exercise of due caution.

4. Even the most peremptory command on the part of the master will not justify or excuse a servant in rashly exposing himself to a known and obvious danger, but the mere fact that the servant by obeying an order of his master exposed himself to such risk of injury as a man of ordinary prudence would not have assumed, and was injured while performing, in obedience to his master's order, a service attended with such hazard as to involve the element of rashness will not preclude the servant's right of recovery if his injury is traceable to an act on the master's part, which, independently of the servant's exercise of his faculties, was the proximate contributing cause of the servant's injury.

5. One of the duties of a master is that of refraining from giving orders which will require the servant to put himself in a position where he will be subject to risk of injury from a dangerous instrumentality.

6. The evidence authorized a finding that the instrumentality was furnished by the master, that the plaintiff was ordered to use it, and that he was also assured by the alter ego of the master that it was safe. The question as to whether the plaintiff knew that the gun was overloaded, and whether he was negligent in obeying the order of the master to shoot the gun, after he had been assured by the master that the gun was safe, was a question of fact for the solution of the jury.

7. The court did not err in refusing the written request for instructions presented by the defendant, for the reason that it contained an intima-

tion of opinion as to what had been proved in the case, and for the further reason that the principles of law stated in the request, so far as they were pertinent, had been fully covered by the general charge of the court, which was full, accurate, and properly adjusted to the evidence.

8. The evidence authorized the verdict, and there was no error in refusing a new trial.

DECIDED FEBRUARY 3, 1915. REHEARING DENIED FEBRUARY 26, 1915.

Action for damages; from city court of Macon—Judge Hodges. April 30, 1914.

*Guerry & Son,* for plaintiff in error.

*Hall & Roberts,* contra.

RUSSELL, C. J. Alonzo Hampton brought suit in the city court of Macon against the Cherokee Brick Company, a corporation, for $5,000 damages on account of the loss of his left hand and other injuries alleged to have been caused by the explosion of a muzzle-loading shotgun which he was instructed by the defendant's superintendent to discharge into one of the brick-kilns of its plant. The discharge of the gun into the kilns was for the purpose of expelling accumulations of soot from the kiln. The plaintiff himself testified that he was unfamiliar with guns of the muzzle-loading type, and had not used this particular gun before that day; that after he had loaded the gun, and the superintendent had rammed down the wadding, he protested to the superintendent of the company that the gun was unsafe, and that he was afraid to discharge it; that the superintendent assured him the gun was safe, and insisted upon his firing it into one of the kilns, the door of which was opened for that purpose by the superintendent, and when he discharged it the barrel exploded, blowing away his left hand. The evidence is in conflict upon some of the material points, but the jury, by their verdict, gave preference to the testimony in favor of the plaintiff, and returned a verdict for $2,500 in his favor.

1. Giving the testimony for the plaintiff, as we must, the preference accorded to it by the jury, it can not be said that the verdict is contrary to law or evidence; and a review of the various special assignments of error presented by the record satisfies us that the trial judge committed no error in overruling the motion for a new trial. In its answer to the plaintiff's petition, the defendant admitted that he received the injuries and suffered pain as alleged, and that he was in its employ, but all the charges of negligence were denied. The gist of the defense, as stated by the learned counsel

for the plaintiff in error, was as follows: that the injuries resulted from the plaintiff's own negligence and the fact that he voluntarily and without knowledge or permission of the defendant abandoned the scope of his employment when he got the gun and overloaded it; that the gun exploded because it was overloaded, and the defendant had no notice that it was deficient, if it was deficient, and the constant use of the gun showed it was not defective. It was further insisted that if the gun was defective, the plaintiff had as much notice of its condition as the defendant. It is further insisted that because the plaintiff had overloaded the gun, he was bound by his own act; and that Goforth, the defendant's superintendent, told him to shoot it because he had overloaded it, and it was his duty, rather than that of any one else, to shoot it. As we have already stated, all the contentions of the defendant as to the facts of the case were disputed by testimony in behalf of the plaintiff, which unequivocally contradicted the defendant's theory of the case, and argument upon these propositions is fruitless, because upon these points the finding of the jury is conclusive. The only question this court is empowered to determine is whether the circumstances of the occurrence in which the plaintiff lost his arm, as related by him, precluded a recovery as a matter of law. He stated that he was wholly ignorant of the use of guns; that he loaded the gun as directed by Goforth, the defendant's superintendent; that after he loaded it he was afraid to shoot it, and would not shoot it until the superintendent ordered him to "poke it up there and shoot it," after having twice assured him that the gun was all right and would not hurt him. The plaintiff swore that Goforth himself rammed the wadding down on the powder, and when the plaintiff told him he was afraid to shoot it, the superintendent replied, "That is all right. Take it and shoot it." The plaintiff had never seen a gun like it before, and testified, "I never had any dealings with a muzzle-loading shotgun in my life." Another witness, testifying in behalf of the defendant, swore that the defendant's superintendent, Mr. Goforth, said to the plaintiff, "You have fooled around and overloaded this gun. You put it in there and you have got to shoot it out." Mr. Goforth himself admitted that when the plaintiff called his attention to the load in the gun and told him that the wadding was hung and the gun overloaded, he replied, "All right, you are the man that loaded it, and you will have to

shoot it." In view of the fact that there is no dispute that Goforth told Hampton to shoot the gun, the court did not err in refusing to charge the jury, as requested, that the plaintiff could not recover if Goforth did not believe or know that the gun was dangerously overloaded. The principle upon which the defendant seems to rely for its defense is, that the contributory negligence of the plaintiff was so great that he can not recover, and it is further argued that the plaintiff, having assumed the risk, can not recover for the consequences of his own act, and further that his act was so rash as entirely to defeat his action. The plaintiff having assumed the ordinary risk of his employment, and it appearing undisputed, in the evidence, that the method by which the defendant cleaned the soot from its brick-kilns was by the discharge of a gun into the openings of the kiln, the plaintiff presumptively assumed the risk of shooting a safe gun furnished by the master, and was bound to use ordinary care in the use of this instrumentality, or not to use it at all if it was apparent that the gun was too defective to be safely used. Ordinarily the plaintiff would have assumed the risk dependent upon improper loading upon his part; for if the accident was the proximate result of the gun's being overloaded by him, of course he could not recover, but if the gun was overloaded according to the master's directions, and the master supplied the defective and dangerous gun, and then, after furnishing and loading this gun and assuring the plaintiff that it was all right to go ahead, and telling him to "poke it up there and shoot it," we are of the opinion that the plaintiff would be entitled to recover, unless it was shown that the plaintiff knew or had good reason to know that the gun was defective, knew that the load with which it was charged was excessive for that particular gun, and shot the gun upon his own judgment, conscious of the risk which might be expected to attend an overcharge of a gun of that make or kind, and conscious also of the danger attending a discharge of the particular load from the particular gun. In other words, the plaintiff might recover if he knew that it would ordinarily be dangerous to discharge as large a load of powder from such guns as he was acquainted with, if any, but did not know it would be dangerous, and from the assurance of his master had been induced to believe it would not be dangerous, to discharge the load which his master put into this gun, with whose qualities his master was acquainted, and which his

master assured him was safe. Under the proof, the assumption of risk by the servant, which is ordinarily to be implied, was abrogated by a distinct order of the defendant's superintendent to use the gun as ordered by him, with the implied assurance that the instrumentality thus employed was safe. As a general rule, the servant assumes the ordinary risks of his employment, including the chances of being injured by the instrumentality furnished by the master for the prosecution of the .work at hand. But when it is apparent that the servant was unwilling to assume the risk, and that he used a defective machine or instrumentality furnished him by the master only because he was expressly commanded to do so, a presumption may arise (from the use of the apparently dangerous instrumentality under the express order of the master) of a quasi new agreement, whereby the master relieved the servant of his former assumption of risk and himself assumed responsibility for injuries which might result to the servant. Whether the evidence as a whole supports such a presumption or rebuts it is to be determined in the light of the circumstances attending the occurrence, and is for the jury. *Massee & Felton Lumber Co.* v. *Ivey,* 12 *Ga. App.* 583 (77 S. E. 1130) ; *Bush* v. *West Yellow Pine Co.,* 2 *Ga. App.* 295, 300 (58 S. E. 529).

2. It is insisted, however, that the danger was so manifest that the act of the plaintiff in discharging the gun, although in obedience to the commands of the alter ego of the defendant, amounted to rashness, and for this reason he can not recover. Of course, the servant can not justify his taking the risk of an obvious danger or excuse gross negligence on the ground that he acted in obedience to his master's command, because his first duty is to exercise due care—the care of an ordinarily prudent man—for his own safety; but the jury had before it not only proof of the order to the servant to discharge the gun, and the fact that this was the customary method of removing soot from the defendant's brick-kilns, but also the fact that this gun was supplied by the master, whose absolute duty it was to furnish safe instrumentalities. It did not appear that the servant had equal opportunity with the master to know that the gun was defective, for he had never seen a gun like it, and the master himself loaded the gun. So really all that the plaintiff did was to overcome what, under the circumstances of the case, had the master properly loaded the gun and had the gun itself not been

defective, would appear to have been an unreasonable nervousness as to discharging the gun, because he did not know what was a proper load, and in his ignorance apprehended that perhaps the load was too large. The fact that the plaintiff, who had never seen a gun like this, was afraid or uneasy would not be conclusive evidence that the gun was defective or that the load was in fact unduly large; and the jury were not compelled to find that he was guilty of any contributory negligence. "In determining what is ordinary care on the part of a given individual, all the circumstances of his position should be regarded, including, in cases like the present, the servant's orders, the demands of his duty, the apparent risk to be met, and the purpose of his action no less than his physical surroundings. Having weighed all these considerations, unless the case then discloses that the risk was such as would not be taken by a man of common prudence so situated, the court can not justly declare that the taking of that risk by the servant, in obedience to orders, was negligence. . . The servant may maintain an action unless he not only knows what is the risk to be encountered but also that it will probably be attended with injury which he can not avoid by the exercise of care and caution. 3 Labatt's Master & Servant (2d ed.), § 1236.

3. Learned counsel for the plaintiff in error insist that the plaintiff was bound to know that the gun was overloaded, and that, therefore, in shooting the gun he incurred a risk and incident injury notwithstanding any negligence of which the superintendent might have been guilty in requiring him to shoot it, and that, under the circumstances, the plaintiff was manifestly guilty of greater negligence in shooting the gun than the defendant's superintendent was in requiring him to shoot it. We have already referred to evidence which authorized the jury to find that the superintendent, and not the plaintiff, loaded the gun, and to the plaintiff's testimony to the effect that he was absolutely ignorant of the quality and character of the gun. But even if it be conceded that the plaintiff had reason to believe it was dangerous to discharge the gun, and even if the testimony to the effect that the gun was old and rusty was sufficient to impute to him knowledge of its defective and dangerous condition, that fact would not necessarily defeat his right to recover. This is especially true because it is undisputed that the defendant's superintendent ordered him

to shoot the gun. Knowledge of a danger is not necessarily conclusive evidence of negligence in failing to avoid it, and there are circumstances under which it does not follow from the fact that the servant voluntarily took some risk that he was not using due care. 3 Labatt's Master & Servant (2d ed.), § 1236. Usually evidence that the servant acted under a direct order negatives the inference of contributory negligence. As said by Labatt (vol. 4 (2d ed.), § 1363), it is plain that negligence can not be predicated of the servant's obedience to an order where he had no knowledge, actual or constructive, of the dangerous condition to which such obedience would expose him. Under such circumstances, the fact that a direct order was given obviously becomes wholly immaterial. But there is also a large class of cases in which that fact is treated as a differentiating element, and in which the courts apply the doctrine that if the testimony goes to show that the servant's compliance with the master's order was the immediate occasion of his being subjected to danger, the conclusion that the servant was negligent in subjecting himself to danger, when the circumstances surrounding the transaction are considered in connection with the order given by the master, may be deemed to be rebutted. "The practical result of this doctrine, when stated in terms of the servant's knowledge, is that the servant may maintain an action unless he not only knows what is the risk to be encountered, but also that it will probably be attended with injury which he can not avoid by the exercise of care and caution. In other cases the extent of the servant's right of action is indicated by a restrictive form of statement, and he is said to be entitled to obey a specific command of his superior without incurring thereby the imputation of contributory negligence, unless the execution of that command involves a hazard to which no ordinarily prudent person would have subjected himself; or unless a reasonably prudent person in his situation and with his knowledge of the danger would not have obeyed the command; or unless the danger was so 'apparent,' or 'obvious,' or 'clear,' or 'manifest,' or 'glaring,' or 'imminent,' that a person of that average prudence and intelligence whose hypothetical conduct is the test of the existence or absence of negligence would have declined, under the given circumstances, to have complied with the order. In other words, if a danger is not so absolute or imminent that the injury must almost necessarily

result from obedience to an order, and the servant obeys the order and is injured, the master will not afterwards be allowed to defend himself on the ground that the servant ought not to have obeyed the order. It does not follow that, because disobedience to the order would have been justifiable, the servant was guilty of negligence in obeying it. Still less will the employer be permitted to escape liability on the ground that by disobeying the order the servant would have avoided injury, where it is a reasonable inference from the testimony that it was the servant's duty, under the given circumstances, to encounter the danger in question. Nor does it follow that, because it may be negligence for a superior servant to order his subordinates into a dangerous position into which he himself is to accompany them, they are therefore negligent in complying with the order." 4 Labatt's Master & Servant (2d ed.), § 1363.

It is to be borne in mind that "the servant does not stand on the same footing with the master. His primary duty is obedience, and if, when in the discharge of his duty, he is damaged through the neglect of the master it is but meet that he should be recompensed." Patterson v. Pittsburg &c. R. Co., 76 Pa. 389 (18 Am. R. 412). The essential inequality in the position of the parties seems to warrant the deduction that "a prudent man has the right, within reasonable limits, to rely upon the ability and skill of the agent in whose charge the common master has placed him, and is not bound at his peril to set his own judgment above that of his superior." Indiana Car Co. v. Parker, 100 Ind. 181. In other words, "When a servant did not assert his judgment in opposition to the supposed better judgment or stronger will of his master, the law usually allows a jury to determine whether he was negligent, or acted in reliance upon the judgment of his master, or out of a constrained acquiescense in the rule of obedience which his relation as servant imposed." 4 Labatt's Master & Servant (2d ed.), § 1364. Our own Supreme Court has held that the question whether obedience to an order apparently dangerous is negligence is one of fact for a jury. In *Central R. Co.* v. *DeBray, 71 Ga.* 406, it was ruled that negligence is not inferable as a matter of law where the evidence shows that a brakeman, who was injured by striking against a skid when complying with an order to dismount at night from a train moving at a rate of from four to six miles an hour, used his

lantern and got off carefully. This ruling was followed in *Augusta Factory* v. *Barnes,* 71 *Ga.* 217 (7), 227 (53 Am. R. 838). See also *Cheeney* v. *Ocean Steamship Co.,* 92 *Ga.* 726 (19 S. E. 33, 44 Am. St. R. 113) ; *City Council of Augusta* v. *Owens,* 111 *Ga.* 464, 473-474 (36 S. E. 830). As was said in *Southern Railway Co.* v. *Diseker,* 13 *Ga. App.* 799, 816 (81 S. E. 269), "There are two principles of law in which knowledge of danger is a salient feature: (1) The doctrine of contributory negligence, which forbids a recovery where the plaintiff knows or should know of the danger and fails to use reasonable care to avoid it, and (2) the maxim embodied in substance in section 2322 of the Civil Code of 1895 (Code of 1910, § 2781)—volenti non fit injuria—which requires the plaintiff to refrain from exposing himself to a known danger, and thus consenting to his own injury. . . In neither case, however, is the knowledge of the danger conclusive of the plaintiff's right to recover. In either event it only imposes a duty,—in the first case to use care to protect himself, in the second to use discretion not to expose himself to a danger so great that a prudent man would refuse to encounter it. A servant will be allowed to recover in any case where he measures up to the full responsibility imposed by his knowledge. [And it is quite apparent that a servant may include as a part of his knowledge the presumption that his employer or employer's agents have done, are doing, and will do their duty.] . . In order to complete the defense of contributory negligence, not only must it be shown that the person injured had knowledge of the danger, but it must also be made to appear that he failed to use reasonable care to avoid it; and the presumption of consent to an injury, which might arise from knowledge of the danger, may be rebutted by the compulsion of the service. . . From this fundamental duty of the master arises the presumption of law and of sound public policy that the servant may, in obedience to direct and specific command, or in response to the no less imperative obligation of faithful, efficient, and eager performance of his work, incur a large degree of danger without shifting the primary responsibility from the master to himself, and hence may recover for an injury received while in the performance of his duty, unless obedience to the command is so obviously and eminently fraught with peril, or unless his performance of the work is so reckless and so rash, that a reasonably prudent man

would act differently." In view of the fact that the plaintiff had only a short while before seen the same gun discharged without danger, and the fact that he had the right, in his condition of ignorance, to rely upon the presumption that the master would not supply him a dangerous instrumentality, as well as in view of the superintendent's assurance that the gun was safe, it can not be said that the jury were not authorized to find that a reasonably prudent man would have acted just as the plaintiff did.

4. Even a direct and immediate order on the part of the master will not justify a servant in rashly exposing himself to a known and obvious danger. But though the servant, at the time of the injury, may be performing a duty so dangerous as to involve the element of rashness, yet if this rash conduct is not a natural, proximate, and contributory cause of his being hurt, and the injuries are received by reason of an independent act on the master's part, the mere fact of the servant's being engaged in the rash conduct mentioned will not preclude his right of recovery. *Southern Cotton Oil Co.* v. *Gladman,* 1 *Ga. App.* 259 (6-7), 260 (58 S. E. 249). Granting that the plaintiff in the present case was negligent in not using his faculties, or in miscalculating the danger of the risk, and conceding that if he had not pulled the trigger the gun would not have been fired, it is nevertheless plain to us that the direct, proximate, contributing cause of the plaintiff's injury was the superintendent's order to him to shoot. Whether this be true or not, the servant had the right to assume that the master's representative, who presumably had superior knowledge of the conditions, would not expose him to unnecessary peril, and an order of the master having the natural tendency to throw the servant off his guard may properly be considered to excuse him from the exercise of the same degree of care as would have been incumbent on him if the case had not involved this factor. Obedience to an order is not contributory negligence in any case in which the servant has the right to assume that the master will warn him as to any danger which the service may involve; and where the servant is entitled to assume that he is ordered to put himself in a dangerous position because his duty requires it, it will be for the jury to say, upon a review of all the circumstances, whether the plaintiff was guilty of negligence.

5. A specific order to do a certain act carries with it an implied

assurance that the act may be done with reasonable safety. One of the duties of a master is that of refraining from giving orders which will require a servant to put himself in a position where the servant will be subject to risk of injury from a dangerous instrumentality. This duty naturally follows from the inherent right to give orders, which every consideration of public policy has conferred upon the master, and the breach of this duty may constitute an actionable wrong. A servant must rely largely upon the presumption that obedience to the orders of his superiors will not unreasonably endanger his safety. Obedience is his paramount duty. "The theoretical right of a servant to throw up his hands and quit his work because some extra hazard appears, and he is exposed to a risk which it is questionable whether he assumed at the time the contract was made, is one whose exercise is practically and humanly speaking impossible. It would require an immediate and accurate determination of the vexed question of what risks were assumed, and ofttimes would exact of an unlettered laborer an instantaneous solution of abstruse legal problems which have perplexed the highest legal tribunals. . . Courage to do the work, rather than care to avoid its danger, is what the public welfare requires." *Sou. Ry. Co.* v. *Diseker,* supra.

6-8. The other questions presented are sufficiently dealt with in the headnotes. The evidence authorized the verdict, and there was no error in refusing a new trial.

<em>Judgment affirmed. Broyles, J., not presiding.</em>