## 6682. WILLIAMS v. ATLANTIC COAST LINE RAILROAD COMPANY.

Since the allegations of the petition disclose that the injury received by
the plaintiff in the defendant's service resulted from the operation of a
natural law, the effect of which the plaintiff could estimate as well as
the master, and that he had equal means with the master of knowing
the obvious danger incident to the performance of his duties in the
place in which the injury occurred and in which he was directed to
work, he assumed the risk, notwithstanding such direction and the
assurance of safety given by the master.

DECIDED MAY 19, 1916.

Action for damages; from city court of Savannah—Judge Davis
Freeman.   May 25, 1915.

*Oliver & Oliver,* for plaintiff in error.

*P. W. Meldrim,* contra.

WADE, J.   Dan Williams brought suit against the Atlantic Coast ·
Line Railroad Company, alleging in his petition that the defend-
ant owned and operated certain repair shops, at which it main-
tained what is known as a "drop pit," across which the tracks
of the company extended, so that when it became necessary to
repair from underneath any locomotive or car, the same could be
moved upon the track extending across the drop pit, and the em-
ployees of the defendant, by working in the drop pit, could make
the needed repairs; that the plaintiff was employed by the defend-
ant company as a "machinist's helper," and his duties required
that he should work on locomotives as they came into the shop,
and on October 6, 1914, he was, in conjunction with other em-
ployees of the defendant company, working on a locomotive, under
the direction of a foreman of the defendant, then and there in
charge of the work; that a locomotive was placed in position on
a track spanning the drop pit, and the plaintiff, acting under the
direction of the said foreman, "had removed what is known as
a binder and a wedge, and had tried to knock from the said loco- ·
motive another appliance underneath said engine, known as the
'shoe,' but the said shoe stuck, and could not be taken out of place;"
that "it then became petitioner's duty, acting under the direction
of Mr. Winn [the said foreman], to place what is known as the
air-jack under the driving-wheel axle of said locomotive, and,
by means of a lever and compressed air, the piston of said air-jack
would rise upward, catch underneath the said axle, and raise the

same to the desired position. Before beginning the operation of the air-jack, petitioner advised the foreman then and there in charge of the work that he was afraid that the shoe might drop off and hurt him, but the said Mr. Winn, then and there in charge of the work, advised petitioner that the shoe was all right, and would not drop out; whereupon petitioner then began to operate the said air-jack, but he was not in such position under the engine that he could observe the said shoe, and, trusting in the assurances and direction of his employer, he then began to make preparation to operate the air-jack;" that "in order that the locomotive upon which he was working should be placed in proper position, so that he might use the air-jack, it was moved backward and forward by another locomotive, operated by the aforesaid Mr. Winn, until it was in the right position, and, while thus being moved, the shoe underneath the engine dropped off, struck petitioner upon his right foot, severely bruising, contusing, crushing and injuring the same." The petition alleged the extent of the injury and the earning capacity of the plaintiff, and claimed damages in the sum of $2,500. The further allegation was added, by amendment, that the foreman in charge of the work, after advising the plaintiff that the shoe was all right and would not drop out, "directed petitioner to continue with his work." The plaintiff still further amended his petition by alleging that the defendant was guilty of negligence, resulting in his alleged injuries, because the foreman whose orders it was his duty to obey "did not make a proper and careful inspection of the shoe of said engine before ordering petitioner to proceed with his work under said engine;" and because the company, through its foreman, negligently and carelessly ordered the plaintiff to perform a piece of work "which said foreman should have known was dangerous, and which petitioner did not know was dangerous, and could not have discovered, in the exercise of ordinary care;" and because the defendant, through its foreman, ordered the plaintiff to work upon a dangerous and unsafe instrumentality and appliance, and to work in a dangerous and unsafe place; and because the company was guilty of negligence in ordering him, through its foreman, "to work in a dangerous and an unsafe place when he did not know, and had not ascertained, that the place would be safe for petitioner to work in."

The petition was demurred to generally, and also on several special grounds, one of which was that the allegation that he would continue to endure pain and suffering "for a long period of time in the future" was too vague and indefinite; another that the paragraph of the amendment alleging that the defendant was guilty of negligence "because the said company, through its foreman, ordered petitioner to work upon a dangerous and unsafe instrumentality and appliance" was vague and insufficient, since no facts were stated which rendered the instrumentality and appliance dangerous and unsafe; and the paragraph in the amendment which alleged negligence "because the foreman then and there in charge of said work ordered petitioner to work in a dangerous and an unsafe place" was demurred to for the reason that it was vague and insufficient, in that the facts were not stated that made the place where petitioner was ordered to work dangerous and unsafe. The court sustained the general demurrer, as well as the special grounds of demurrer above mentioned, and passed the following order: "I think the foregoing grounds of special demurrer, the 2nd ground of first special demurrer, and the general demurrer are all good and they are sustained. The petition is based upon an injury due to the operation of the law of gravity, and the plaintiff can not claim ignorance thereof. The case is dismissed."

Since, in our opinion, the court did not err in sustaining the general demurrer, it is unnecessary to consider in detail the special grounds referred to above. Unquestionably so much of the amendment to the petition as alleged negligence on the part of the defendant because the appliance upon which the plaintiff was required to work was unsafe and the place where his work was to be done was dangerous is without merit, since the allegations in the petition disclose that the plaintiff was a "machinist's helper," presumably familiar with his duties as such, as well as with the particular work he was called upon to perform at the time he was injured, and also familiar with the nature and character of the place where he was required to work. "Where a master employs a servant to repair defective machinery, the rule as to furnishing reasonably safe machinery does not apply to the machine to be repaired. *Green* v. *Babcock Lumber Co.*, 130 *Ga.* 469 [60 S. E. 1062]." *Holland* v. *Durham Coal Co.*, 131 *Ga.* 715, 720

(63 S. E. 290). It is clear then that there could not be a recovery for the failure of the defendant to furnish "reasonably safe machinery" to be repaired; and no facts are stated in the petition upon which to base the conclusion of the pleader that the place furnished the plaintiff for his work was itself dangerous, and in fact the injury complained of clearly appears not to have resulted from any inherent defect or dangerous character or condition of the "drop pit," the place where he was required to do his work in repairing the defective machinery.

A servant is bound to exercise skill and diligence, and takes upon himself the burden of establishing negligence on the part of the master and due care on his own part, where he seeks a recovery for injuries of this character. "No recovery can be had upon mere proof of negligence on the part of the master; but the plaintiff must show, in addition to the exercise of due care on his own part, that he was not aware of the danger, that his opportunities for knowing the existence of the danger were not equal to those of the master, and that in the exercise of ordinary care he could not himself have known of the danger. Civil Code, § 3131; *W. & A. R. Co.* v. *Bishop,* 50 *Ga.* 465; *Brush Electric Light & Power Co.* v. *Wells,* 103 *Ga.* 512, 515 (30 S. E. 533); *McDaniel* v. *Acme Brewing Co.,* 113 *Ga.* 80 (38 S. E. 404); *McDonnell* v. *Central Railway Co.,* 118 *Ga.* 86, 89 (44 S. E. 840)." *Kilgo* v. *Rome Soil Pipe Manufacturing Co.,* 16 *Ga. App.* 737 (86 S. E. 82). The servant assumes the ordinary risks of his employment, and, to authorize a recovery for injuries incurred in connection therewith, it must appear, as stated in the quotation from the *Kilgo* case, supra, that he did not know and had not equal means with the master of knowing the existence of the defects or dangers and by the exercise of ordinary care could not have known thereof. Civil Code, §§ 2611, 2612. See also *Baxley* v. *Satilla Manufacturing Co.,* 114 *Ga.* 720, 723 (40 S. E. 730). Nor is it necessary for the master to give warning of a danger that is obvious. *Crown Cotton Mills* v. *McNally,* 123 *Ga.* 35 (51 S. E. 13).

The main theory upon which the plaintiff based his right to recover was that the master, through the foreman, had expressly instructed him to undertake the work of repair in a position where his safety would be endangered by the falling of the metal "shoe"

when the engine should be lifted up by means of a jack, and that, by advising him "that the shoe was all right and would not drop out," the master insured the safety of the place where he was directed to work, and of the operation he was instructed to undertake. It is true that the implied agreement on the part of a servant to assume the risks ordinarily incident to the service for which he is employed may be abrogated by a distinct order on the part of the master to use a dangerous appliance in a manner directed by the master, where the order is accompanied by an express or an implied assurance that the instrumentality which the servant is directed to use is safe; and under such circumstances the order of the master may amount to a waiver of his right to insist upon the servant's implied obligation to assume risks, and thereafter estop the master from asserting that the servant assumed the hazard attending the act which the master himself directed. However, "even the most peremptory command on the part of the master will not justify or excuse a servant in rashly exposing himself to a known and obvious danger." *Cherokee Brick Co.* v. *Hampton,* 16 *Ga. App.* 53 (4), 63 (84 S. E. 328). In *Studevant* v. *Blue Springs Lumber Co.,* 16 *Ga. App.* 668 (85 S. E. 977), it was said: "The fact that the vice-principal of the defendant company (who was in charge of the mill and of the operation thereof, with authority to employ hands and give orders to the employees, all of whom were under his direction, including the plaintiff) directed the plaintiff to perform a particular act would not relieve the plaintiff from the legal consequence of assuming the risk of an obvious danger and attempting to replace a belt while the machinery to which it was attached was in motion, where nothing appears to indicate any less certain, definite, and precise knowledge of the hazard thereby incurred than the superintendent himself was in possession of."

From the allegations in the petition it is clear that the plaintiff was thoroughly acquainted with the place where he was required to work; his duty was to repair defective, unsafe, and dangerous machinery, and he was at the time of the injury in the very place provided for that particular work. As he stood in the drop pit for the purpose of repairing the locomotive, he had entire knowledge of the existence and location of the wedge and shoe, and of whatever danger could be apprehended therefrom, since the peti-

tion alleges that he himself advised the foreman of the existence of such danger. He had removed the wedge and attempted to knock from the locomotive the "shoe," but the shoe stuck and was not dislodged, and he thereupon caused the locomotive to be moved, so that he might place a jack under the axle. He raised the locomotive by the use of a jack, and, the wedge being then removed by him, the shoe fell when the weight of the engine pressing upon it was removed. As learned counsel for the defendant facetiously but aptly says in his brief: In "falling it was natural that the shoe should have sought the negro's foot." The shoe fell as a natural consequence, necessarily to be expected when the weight of the engine was removed and the influence of gravity was thereby allowed to assert itself.

Any extensive knowledge of the laws of physics can not, of course, be expected of ordinary laborers, but the existence of those primal forces which govern the universe and control all matter, and which come necessarily under the observation of every man, whether learned or unlearned, master or servant, during the entire term of his natural existence, must be held to be within his knowledge at all times and places and under all conditions. Certainly the servant in this case had equal means with the master of knowing, and understood as thoroughly as did the foreman, representing the master and directing the laborers, that the attraction of gravity would draw forcibly to the earth a heavy piece of iron, when every existing support sustaining it aloft was removed. Nor can it be said that the master was any better aware of this fact than the servant. To the contrary, the servant, by reason of his location at the time of the injury (if it could by any chance be said that one knew better than the other what the probable result would be from the uncontrolled operation of the law of gravity) knew better than the master the dangers incident to the situation.

Among all the great forces of nature, perhaps the dawning intelligence first makes acquaintance with gravity, for even the infant, before he is able to toddle along unaided, discovers that an object released from his feeble grasp will fall, and may produce pain if dropped upon his tender foot or hand, and during all the years which lie between infancy and old age the influence of this universal power is daily witnessed by every reasoning person, and to some extent is often apparently noted and guarded against by

animals supposed to be incapable of reason. The ordinary results to be expected from the operation of the attraction of gravity are so well understood and so universally recognized by mankind that we involuntarily dodge a falling object and avoid passing under or near heavy objects, insecurely or insufficiently supported aloft from the bosom of mother earth, and it is just as natural for one instinctively to avoid placing himself beneath or near an unattached heavy, overhanging object, as it is for the eye almost automatically to close when nearly approached by any missile or other foreign matter. The plaintiff must necessarily, therefore, have known at the time he assumed or decided to remain in the position of risk that any jar or sudden movement would almost certainly detach the unsupported and heavy metal shoe from the engine, and that gravity would then inevitably bring it with dangerous momentum to the ground; and he was in far better position at the exact time than was the master (acting through its foreman) to know where and when the shoe would probably fall when the locomotive was moved, and to estimate the danger of the place and of his position when the fall occurred, notwithstanding his allegation that he was so situated that he could not at the time see the shoe itself. So far as appears, he knew how the shoe was attached to the engine, and that it was not fastened independently; he knew the considerable weight of the unsecured object overhanging him, and that it would be irresistibly drawn to the earth if dislodged by the movement of the locomotive, and would almost certainly strike and inflict an injury upon him, and yet accepted the obvious risk and remained in the dangerous position after he had "jacked up" the engine and while it was being removed.

We think the trial judge did not err in sustaining the general demurrer and dismissing the petition. *Judgment affirmed.*